# STATE OF CONNECTICUT *v.* EDWARD RADZVILOWICZ
## (AC 14734)

O'Connell, C. J., and Lavery and Healey, Js.

Argued May 5—officially released September 30, 1997

*Lewis H. Chimes*, special public defender, for the appellant (defendant).

*Rita M. Shair*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, *John Waddock*, assistant state's attorney, and *Dennis O'Connell*, law student intern, for the appellee (state).

*Opinion*

HEALEY, J. After a trial to a jury, the defendant, Edward Radzvilowicz, was found guilty on all counts of two informations that had been consolidated for trial. One information charged the defendant with two counts of larceny in the first degree in violation of General Statutes §§ 53a-119[1] and 53a-122 (a) (2) and four counts of forgery in the second degree in violation of General Statutes § 53a-139 (a) (2).[2] The other information

---

[1] General Statutes § 53a-119 provides in relevant part: "Larceny defined. A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ."

General Statutes § 53a-122 provides in relevant part: "Larceny in the first degree: Class B felony. (a) A person is guilty of larceny in the first degree when he commits larceny as defined in section 53a-119 and . . . (2) the value of the property or service exceeds ten thousand dollars . . . ."

[2] General Statutes § 53a-139 provides in relevant part: "Forgery in the second degree: Class D felony. (a) A person is guilty of forgery in the second degree when, with intent to defraud, deceive or injure another, he falsely

charged the defendant with one count of larceny in the first degree in violation of General Statutes §§ 53a-119 and 53a-122 (a) (2). The defendant was sentenced to a total effective sentence of twenty years on all convictions.[3] This appeal followed.

On appeal, the defendant claims that (1) the trial court erroneously consolidated the two informations, (2) the evidence on the one count information charging him with larceny in the first degree from Michael Tavarozzi and Holiday Foods, Inc. (HF, Inc.), was insufficient as a matter of law to prove that he wrongfully appropriated assets of HF, Inc., because he was an owner of that company, (3) his conviction for forgery of the federal income tax documents must be set aside as violating the supremacy clause of the United States constitution, and (4) the prosecutor's references in his closing argument to the defendant as a "con man" so infected the trial with unfairness as to constitute a denial of due process.

I

A

Among the facts that the jury reasonably could have found with reference to the six count information are the following. Sometime in the spring of 1990, Edward Chicoski and Rafael Sandoval formed three Connecticut corporations, of which they were the sole owners. These corporations were Holiday Foods of Connecticut,

makes, completes or alters a written instrument or issues or possesses any written instrument which he knows to be forged, which is or purports to be, or which is calculated to become or represent if completed . . . (2) a public record or an instrument filed or required or authorized by law to be filed in or with a public office or public servant . . . ."

[3] After the guilty verdicts on the two consolidated informations, the defendant pleaded guilty to a charge of violation of probation based on the underlying charges. The sentence on that charge was made concurrent with the effective twenty year sentence imposed under the consolidated informations.

Inc. (HFCT), Holiday Foods of Massachusetts, Inc. (HFMA) and Holiday Foods of New England, Inc. (HFNE). Their businesses involved the sale and delivery of six months supply of food to homeowners, as well as the sale of freezers. HFCT and HFMA were more active than HFNE. The latter corporation was to become more active if the other businesses expanded. Sandoval was mostly at the HFMA office in Massachusetts, although, on occasion, he came to the HFCT office in Cheshire. Michael Tavarozzi originally worked for HFMA as the branch sales manager but later came to work for HFCT at the Cheshire office. Chicoski, in addition to his interest in the three corporations, was also the sole owner of Valley Food Distributors (Valley Food) in Waterbury. Valley Food operated a meat plant that processed meat for home freezer plans, restaurants and institutions. HFCT and HFMA purchased their products from Valley Food. Chicoski's major concentration was Valley Food, where he generally worked from 5 a.m. to 5 p.m. After closing Valley Food, he would go over to the HFCT office in Cheshire for a "couple of hours at night." He was not really actively involved in the day-to-day operations of any of the three corporations that he and Sandoval had formed. Marilyn Halpert worked for HFCT at the Cheshire office as credit manager and administrative assistant, and also did general office work. Katherine Favale was the full-time bookkeeper and did the financial record keeping manually at that office. The payroll for the Holiday Food corporations was handled by an outside payroll service because there were so many transactions. Prior to the formation of HFCT and HFMA, Halpert and Favale had worked with Chicoski for fifteen to twenty years.

Business kept expanding. Favale was not able to keep up with the work and could not learn to use computers efficiently enough to do the accounting in an automated fashion. Chicoski described her as "computer illiterate."

Chicoski and Sandoval decided to hire a "full-charge bookkeeper-controller" to take care of the financial record keeping of all three companies who would know how to use the computer in performing all the accounting functions. An advertisement was placed in the newspaper for such a position.

In September, 1990, Chicoski and Sandoval hired the defendant at a salary of $400 per week. While his salary would be paid by HFCT, his duties included handling the finances of both HFCT and HFMA. The defendant was computer literate. His employers indicated that his duties would include taking charge of payroll, normal bookkeeping control, accounts payable and monitoring incoming receivables. The defendant's initial responsibility was to set up an appropriate computer accounting system, which he did with the aid of a programmer. He also was to handle accounts payable through the computer, as well as accounts receivable from customers. In addition, he was in charge of handling the general ledger, doing check reconciliations, making deposits and writing checks. The defendant worked in the Cheshire office. Shortly after he came to work, the defendant told Chicoski that he could save the companies a "lot of money" by doing the job of the outside payroll service, the cost of which was significant, and buying a payroll package that was compatible with their accounting package so that payroll could be handled in-house. A computer software package to accomplish the payroll function in-house was purchased. As the defendant explained to Chicoski, the purpose of that program was to calculate all of the payroll and federal and local taxes in-house, and to write employees' checks. After this program was set up, the defendant was the only person who knew how to use it[4] and had the password to gain

---

[4] An outside programmer assisted the defendant in setting up this new computer program. There is no claim in these cases that the programmer did anything else.

access to all the various functions of the new computer accounting program, and he was the only person responsible for handling the 941[5] tax forms. Favale had previously handled those forms and, as long as she did, there had been no problem with the Internal Revenue Service (IRS). Favale left her employment there before the defendant started. According to Sandoval, the companies "had replaced [Favale] with [the defendant]." No one ever filled out the 941 tax forms except Favale and the defendant. Halpert left her employment there not long after Favale. Chicoski continued to go to the Cheshire office "probably every day" after leaving his Waterbury place of business. He thought that the defendant was a "very conscientious, hard working employee" because the defendant was there when Chicoski arrived and when he left. The defendant always picked up the mail and "took care of it." On occasion, he even went to the Massachusetts office of HFMA, where he would do some of the "bookkeeping functions" for HFMA. Chicoski drove there with him once or twice in the defendant's Mercedes. The defendant had a Toyota when he first went to work for these corporations. The defendant told Chicoski that he had inherited a large sum from his father and even showed him a New Haven Savings Bank passbook with $700,000 or $800,000 in it.

As time passed, there were many weeks when the defendant told Sandoval, who in turn told Chicoski, that HFCT did not have enough money to pay for the food being purchased. This included food purchased from Valley Distributors. This was difficult for Sandoval and Chicoski to believe because of the volume of sales.

[5] Form 941 is a quarterly United States payroll tax return an employer files under a corporate name and an assigned number. It lists wages paid, social security taxes paid and income tax withheld. It is an official record required to be filed with the Internal Revenue Service.

Toward the end of 1991, Chicoski and Sandoval decided to sell the assets of HFCT because it was not making money. They reached that conclusion because of financial statements and profit and loss statements generated by the defendant. Tavarozzi, who had worked out of the Connecticut office, originally had the idea of attempting to purchase the assets of HFCT. He was not familiar with the defendant's later disclosed conduct concerning his handling of the records and check writing of HFCT or HFMA. Tavarozzi sounded out the defendant on the idea of buying HFCT. The defendant was receptive. Two other employees of HFCT, William Scharr and Allen Carder, became part of the group. Tavarozzi approached Chicoski about a proposed purchase. The participation of the defendant within the group was not disclosed to Chicoski or Sandoval. An agreement was reached late in 1991 to sell the assets of HFCT. At that time, the defendant worked for both HFCT and HFMA. After the sale, HF, Inc., was formed as a Connecticut corporation. Tavarozzi and the defendant owned 51 percent, and Scharr and Carder owned 49 percent of HF, Inc.[6] Chicoski would not have sold the assets of HFCT had he known that the defendant was one of the buyers. Sandoval was enthusiastic about the sale. Even though HF, Inc., had been formed after the sale of HFCT's assets, the latter corporation operated until about February, 1992, to clean up odds and ends.

In 1992, an IRS investigator, Linda Rheault, discovered discrepancies in certain filed 941 forms of HFCT and HFMA. These involved the amounts being paid and the indication that there were no employees. The discrepancies began with the filing for the September, 1990, quarter. Prior to that time, there had been no problem with the IRS concerning the 941 filings. The names on the forms involved were those of Favale and

---

[6] Some time later, Tavarozzi and the defendant purchased the interests of Scharr and Carder, leaving them as the sole owners of HF, Inc.

Halpert, who, in fact, did not sign those forms. The defendant had forged their signatures. As a result of the investigation, the IRS filed a levy in excess of $40,000 on the assets of HFCT and one in excess of $105,000 on the assets of HFMA, as well as one of $90,000 against HF, Inc. Both Chicoski and Sandoval were amazed when they learned this. They believed that the income generated was sufficient to have paid the IRS the tax liability. They had even seen checks concerning them drafted to the IRS. Both Chicoski and Sandoval contacted the IRS. They realized that the defendant had been taking corporate moneys. They had virtually no success in trying to retrieve information from the hard drive in the Cheshire office's computer, which Sandoval said had been "corrupted." There were also two years of backup tapes missing. After the defendant was terminated, Chicoski and Sandoval contacted the defendant to have him return corporate records he had. Very few of these were returned. They went to the Cheshire police, who then conducted an investigation through Detective Truax Glass. He recovered $97,000 in cash and company checks made out to the defendant or his personal creditors for the year 1992. The defendant had earlier formed an entity known as TR Enterprises (TRE), in which he and Tavarozzi were the sole principals. The defendant had opened a savings account in its name in the New Haven Savings Bank. During the time in question, the defendant had deposited approximately $131,000 in the TRE account. This included $45,750 in canceled company checks payable to TRE. The purchases, which were not authorized business expenses, included a $21,000 cash payment toward a Mercedes, and payments for trips to Florida for himself and others, for hotel bills of over $700 a night, toward a twenty-eight foot boat and for a $50 tip for drinks at America's Cup Restaurant. Checks drawn by him on the HFCT account included $2000 to Merrill Lynch,

$1964.16 to Radio Shack and $1515.92 to Health Works. There were other unauthorized checks drawn by the defendant.[7]

The defendant was authorized to write corporate checks only for business purposes, but not to himself personally. He was never given authority to write checks for purposes other than corporate business drawn on HFCT and HFMA. Specifically, he was also never authorized to draw checks to TRE on the accounts of either HFCT or HFMA.[8] The defendant was never authorized to write, as he did on occasion, checks to cash on either the account of HFCT or HFMA. The same lack of authority applied to the defendant's writing checks on those corporate accounts to himself for personal services. The defendant, without authority, drew a large number of checks on HFCT and HFMA to himself for nonbusiness purposes and to TRE in furtherance of his common scheme and design.

### B

Among the facts the jury reasonably could have found as to the single count information charging the defendant with larceny in excess of $10,000 from Michael Tavarozzi, individually, and HF, are the following. Tavarozzi, prior to coming to Connecticut to work for HFCT, had worked for HFMA in Massachusetts as branch sales manager there. Upon his transfer to Connecticut, he became branch sales manager for HFCT. While in Massachusetts and upon his transfer to HFCT

---

[7] During oral arguments in this court, defendant's counsel conceded that the $10,000 threshold for the two larceny counts in the multicount information was not in issue. See General Statutes § 53a-122 (a) (2). He argued, however, that there was no evidentiary basis for finding the $10,000 threshold as to the single count information charged as to Michael Tavarozzi individually and HF, Inc.

[8] Actually, Chicoski did not know of the existence of TRE until after the arrest warrants for the defendant were issued. Neither Chicoski nor Sandoval had any interest in TRE.

in Connecticut, he was not involved in financial record keeping of those companies or their computer. Tavarozzi first came to know the defendant in the latter part of 1990, when the defendant was hired as controller, handling the corporations' financial records. The defendant told Tavarozzi that he was a college graduate and had his certification as a public accountant.[9] The defendant also told him that he was still doing accounting work for other companies, in particular for G-Tech Corporation in Rhode Island. G-Tech, the defendant told Tavarozzi, was owned by the Snowden family, for whom he also did some work. He told Tavarozzi that he was billing the family "anywhere from ten to twenty thousand monthly for accounting work" and that he would go to Rhode Island to "pick up the moneys" or that they "were wired to him, his personal account." After Tavarozzi worked for HFCT in Connecticut, he still had nothing to do with the computer, the payroll account or the bookkeeping of HFCT. He did not even have the "password to get into those various programs . . . ." Only the owners and the defendant had that.

While working for HFCT, the defendant approached Tavarozzi and asked whether he wanted to go into business with him outside of HFCT. The defendant told him that he had a "lot of experience" in accounting, had a "lot of income" coming from his accounting practice outside of HFCT and that he wanted to invest those moneys. Tavarozzi indicated that he had no capital to get involved with something of that nature, but the defendant asked him to become involved in managing properties or overseeing real estate investments for him. Tavarozzi agreed. The defendant then did the paperwork, setting up the partnership TRE, with Tavarozzi and the defendant as partners. A New Haven Savings Bank checking account was set up for TRE. TRE

---

[9] The defendant, during his trial testimony, admitted that neither of these representations were true. He had also made the same representations to Chicoski and Sandoval.

initially was to purchase real estate for rental income and later was to invest in stocks and bonds. The defendant opened a TRE account with Merrill Lynch. The defendant kept control of the ledgers and bookkeeping of TRE with very little active participation by Tavarozzi. Neither he nor the defendant told either Chicoski or Sandoval about TRE.

The initial idea of considering a purchase of the assets of HFCT from the owners, Chicoski and Sandoval, was Tavarozzi's. After some discussion, a purchase of HFCT was contemplated by Tavarozzi, the defendant and William Scharr and Allen Carder,[10] all four of whom were then employees of HFCT. Tavarozzi began negotiations with Chicoski in September, 1991. The defendant did not want the owners to know that he had any interest in purchasing the assets of HFCT and his involvement was not disclosed to the owners.[11] Tavarozzi was aware, when he was negotiating the proposed purchase, that Chicoski wanted to sell because HFCT was losing money. By the time of the closing of the sale, Tavarozzi had negotiated to put down $50,000. Tavarozzi, Scharr and Carder each put in $10,000 and the defendant put in $20,000. The sale was finalized in December, 1991. HF, Inc., was the new corporation formed that took over the assets of HFCT. Tavarozzi and the defendant had 51 percent of the shares while Scharr and Carder had 49 percent. When HF, Inc., began, the salary agreement for Tavarozzi and the defendant was that each of them was to receive $250 weekly. The reason for that low salary was that prior to the purchase of HFCT, the defendant had offered him work in another company that the defendant owned named Valtech. Halfway through 1992, both Scharr and Carder were

---

[10] William Scharr was the assistant branch manager of HFCT and Allen Carder was the telemarketing manager of HFMA.

[11] The interest of Scharr and Carder in a potential purchase was also not disclosed during the negotiations.

bought out on the basis of an earlier agreement permitting a buyout upon repayment of their original investment.

The defendant undertook and maintained control of the financial record keeping of HF, Inc., including checking and disbursements. The defendant, who also continued to control TRE, told Tavarozzi that he owned Valtech. He said that he wanted Tavarozzi to work for Valtech, doing such things as preparing a pension plan[12] for its employees and keeping a closer eye on its customer base. His salary was to be $971 net, which was to be deposited directly in an account from which the teller could disburse that amount into Tavarozzi's account. Tavarozzi filled out the forms for this, which were given to the defendant. The defendant also asked Tavarozzi if he wanted to become a shareholder in Valtech and, later, showed Tavarozzi certain documents in which he represented that Tavarozzi had become a shareholder. Actually, the defendant never was the owner or a shareholder and never had any interest in Valtech. The defendant also interested Tavarozzi in the potential purchase of a restaurant named "Chuck Wagon" from G-Tech and the Snowden family. Tavarozzi tried to check out its location, but was unable to do so. After confronting the defendant with that failure, Tavarozzi received a letter from a lawyer[13] indicating that the mixup was due to the fact that the name had been changed to "Casa Lupita." The defendant told Tavarozzi that Tavarozzi had a financial interest in the

---

[12] The defendant provided him with a payroll summary of Valtech and a list of its employees so that Tavarozzi could begin working on the pension plan.

[13] At the trial, the attorney whose name was "signed" to this letter testified. Although the letterhead looked like his, he said that the signature was not his. He had never heard of the "Chuck Wagon" restaurant or the "Casa Lupita" or the Snowdens of Rhode Island. He knew nothing about the contents of the letter. Moreover, he did not recognize the defendant, who was pointed out to him in the courtroom, as anyone he had ever seen before.

Chuck Wagon-Casa Lupita matter. The defendant promised Tavarozzi a weekly salary of $579 from Casa Lupita. The defendant told him that there was to be a sale of Chuck Wagon for "around three million dollars" and that Tavarozzi was "to receive 1.3 million of that at the closing" and the rest "we were planning to reinvest into other restaurants . . . ." The defendant, when pressed by Tavarozzi, produced what was represented to be a certificate of limited partnership for "Chuck Wagon, Inc., doing business as Casa Lupita" with partners listed as Jennifer Snowden, Diane Snowden, the defendant and Michael Tavarozzi, and with Jennifer Snowden and the defendant listed as general partners. The defendant even showed Tavarozzi a check for $200,000 with a letter that stated that that sum was a pay-down of the initial moneys used in the sale of Casa Lupita from Scott Pelton, a potential buyer from North Carolina. Jennifer Snowden testified that she had never had any financial intent or owned any part of Casa Lupita, which was a restaurant across the street from her home in Rhode Island. She had met the defendant when he was the bookkeeper for the bar operated in connection with a horse farm owned by her brother-in-law. In addition, she worked for G-Tech as an administrative assistant. The defendant, according to her, never worked for G-Tech as "an accountant, bookkeeper-controller of G-Tech" nor did she believe that he was "paid ten to twenty thousand dollars a month by G-Tech for any purpose." Chuck Wagon was the name of a concession stand Jennifer Snowden operated at her brother-in-law's horse farm and it was open only when there was a horse show. She did not know who Michael Tavarozzi was. The defendant was never a partner with her, and the signature on the limited partnership certificate was not her signature.

In 1992, the defendant showed Tavarozzi a document on TRE stationery[14] indicating the "Income Statement

---

[11] The address of TRE on that letterhead was "111 DeKoven Drive, Middletown, Connecticut," which was the defendant's residence.

for the period April 10, 1992, to July 15, 1992, concerning Casa Lupita Two" that had a profit and loss statement from that restaurant showing a net profit for that period of $98,692.29. That restaurant, the defendant represented, came into existence as a result of the sale of Casa Lupita One. Tavarozzi was told he was to get weekly income from this restaurant but he did not personally receive any in hand as it was allegedly deposited into a checking account handled by the defendant.[15] Such weekly payments to Tavarozzi from Valtech and Casa Lupita went directly into this checking account and Tavarozzi filled out the paperwork presented to him by the defendant to further that end. Tavarozzi believed that income was coming from investments[16] being made by TRE. He did not believe that any of the moneys would be coming from HFCT or HFMA. In fact, they were coming from HFCT.

Neither the defendant nor Tavarozzi had the authority to write checks on the HF, Inc., account to themselves or to cash for large sums of money for noncompany purposes. The defendant, however, did so on many occasions. For example, in a period of less than six months, the defendant drew, endorsed and deposited checks on the HFCT operating account, payable to himself, in excess of $45,000. Eleven of these checks were for $2000 or more, one for $7000. Some of his purchases included a Mercedes and several trips to Florida for himself and others including plane fare, hotel accommodations and drinks. One hotel suite cost $770 per night,

[15] The defendant had also shown Tavarozzi a document that he claimed was an income statement of TRE from December 12, 1991, to March 30, 1992, showing that it was doing "very well." The statement showed, inter alia, income from Valtech and G-Tech and a New Haven Savings Bank account of $850. This bank account was closed out showing a balance of zero on September 30, 1992.

[16] The defendant indicated to Tavarozzi moneys earned by TRE were also invested in two other restaurants: Carriage Drive of Rhode Island, Inc., and Casa Lupita in New Jersey. During her testimony, Jennifer Snowden said that she believed Casa Lupita was a "chain."

and his tips included those for $20 and $50. Among other checks he drew were $6000 to Merrill Lynch, $1964.16 to Radio Shack and $400 to G. Fox. Even after his association with HFCT terminated, he drew checks to himself, and endorsed and deposited them. There were other unauthorized checks, amounting to thousands of dollars, that the defendant drew to himself, endorsed and deposited to his account. There were also unauthorized checks he drew to cash, endorsed and deposited.

While Tavarozzi and the defendant were associated in HF, Inc., after it formed early in 1991, the defendant was responsible for the preparation and filing of certain federal and state tax forms concerning sales, employees, income and other forms. The defendant did show to Tavarozzi the forms he had prepared, together with the checks for the amount of taxes to be paid. These checks were never endorsed or deposited. Rather, the defendant was diverting those funds to his own use. Later, when the IRS filed liens on HF, Inc., that company dissolved. In addition, there were in evidence two checks drawn on HF, Inc., for $971.60 and $750 made out to Tavarozzi by the defendant allegedly representing payment for his work with Valtech and as payment on the alleged Casa Lupita account. Both checks, however, which bore Tavarozzi's name as the endorser, had been endorsed not by Tavarozzi but by the defendant. Both were endorsed "for deposit only."

## II

As to the single count information charging the defendant with larceny in the first degree pertaining to Tavarozzi, individually, and HF, Inc., the defendant claims that the evidence was insufficient as a matter of law to sustain his conviction. He claims that as an owner and "authorized officer" of HF, Inc., he had a right to withdraw funds from HF, Inc., and that the evidence

failed to prove that his appropriation of the assets of HF, Inc., was without the consent of the owner. As to Tavarozzi individually, the defendant claims that there is no evidence that Tavarozzi individually gave any funds or property toward any of his purportedly fictitious schemes. It is worth pointing out here that the defendant does say that while there is "strong evidence of [his] fraudulent character and propensity to commit fraud, it does not overcome the lack of evidence that [he] lacked authority to withdraw funds from" HF, Inc. The state rejects those claims and maintains that the evidence was sufficient to prove the defendant guilty of larceny by embezzlement by wrongfully appropriating the property of another in his care and custody in violation of General Statutes §§ 53a-119 and 53a-122 (a) (2). Its position is that the property[17] at issue is that of Tavarozzi and HF, Inc. We agree with the state.

"Our Supreme Court has stated: In reviewing [a] sufficiency [of evidence] claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . *State* v. *Sivri*, 231 Conn. 115, 126, 646 A.2d 169 (1994), quoting *State* v. *Greenfield*, 228 Conn. 62, 76, 634 A.2d 879 (1993); *State* v. *Famiglietti*, 219 Conn. 605, 609, 595 A.2d 306 (1991); *State* v. *Jarrett*, 218 Conn. 766, 770–71, 591 A.2d 1225 (1991); *State* v. *Weinberg*, 215 Conn. 231, 253, 575 A.2d 1003, cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990).

"The evidence must be construed in a light most favorable to sustaining the jury's verdict. *State* v. *Carter*,

---

[17] General Statutes § 53a-118 (a) (1) provides in relevant part: " 'Property' means any money, personal property, real property, thing in action, evidence of debt or contract, or article of value of any kind. . . ."

[196 Conn. 36, 44, 490 A.2d 1000 (1985)]. It is within the province of the jury to draw reasonable and logical inferences from the facts proven. Id.; *State* v. *Williams*, 169 Conn. 322, 336, 363 A.2d 72 (1975). The jury may draw reasonable inferences based on other inferences drawn from the evidence presented. *State* v. *Williams*, 202 Conn. 349, 355, 521 A.2d 150 (1987); *State* v. *Carter*, supra, 44–45; *State* v. *Gabriel*, 192 Conn. 405, 425, 473 A.2d 300 (1984) . . . . Our review is a fact based inquiry limited to determining whether the inferences drawn by the jury are so unreasonable as to be unjustifiable. . . . *State* v. *Ford*, 230 Conn. 686, 692, 646 A.2d 147 (1994). We note that the probative force of the evidence is not diminished because it consists, in whole or in part, of circumstantial evidence rather than direct evidence. *State* v. *Robinson*, 213 Conn. 243, 254, 567 A.2d 1173 (1989). *State* v. *Lago*, 28 Conn. App. 9, 30, 611 A.2d 866, cert. denied, 223 Conn. 919, 614 A.2d 828 (1992). It has been repeatedly stated that there is no legal distinction between direct and circumstantial evidence so far as probative force is concerned. *State* v. *Haddad*, 189 Conn. 383, 390, 456 A.2d 316 (1983); *State* v. *Perez*, 183 Conn. 225, 227, 439 A.2d 305 (1981). It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. *State* v. *Perez*, supra, 227. . . . *State* v. *Braxton*, [196 Conn. 685, 691, 495 A.2d 273 (1985)]. . . . *State* v. *King*, 216 Conn. 585, 602, 583 A.2d 896 (1990); *State* v. *Cimino*, 194 Conn. 210, 211, 478 A.2d 1005 (1984). [T]he inquiry into whether the record evidence would support a finding of guilt beyond a reasonable doubt does not require a court to ask itself whether *it* believes that the evidence . . . established guilt beyond a reasonable doubt. . . . Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements

of the crime beyond a reasonable doubt. . . . *State* v. *Boykin*, 27 Conn. App. 558, 563–64, 609 A.2d 242, cert. denied, 223 Conn. 905, 610 A.2d 179 (1992). In doing so, we keep in mind that [w]e have not had the jury's opportunity to observe the conduct, demeanor, and attitude of the witnesses and to gauge their credibility. *State* v. *Rodriguez*, 200 Conn. 685, 693, 513 A.2d 71 (1986)." (Emphasis in original; internal quotation marks omitted.) *State* v. *Ingram*, 43 Conn. App. 801, 809–10, 687 A.2d 1279 (1996), cert. denied, 240 Conn. 908, 689 A.2d 472 (1997).

A person is guilty of larceny by embezzlement "when he wrongfully appropriates to himself or to another property of another in his care or custody." General Statutes § 53a-119 (1). A person is guilty of larceny by embezzlement in the first degree where "the value of the property . . . exceeds ten thousand dollars . . . ." General Statutes § 53a-122 (a) (2); see *State* v. *Pearl*, 28 Conn. App. 521, 527, 613 A.2d 304 (1992). "The crime of embezzlement is consummated where . . . the defendant, by virtue of his agency or other confidential relationship, has been entrusted with the property of another and wrongfully converts it to his own use." *State* v. *Lizzi*, 199 Conn. 462, 467, 508 A.2d 16 (1986); see *State* v. *Harris*, 147 Conn. 589, 592, 164 A.2d 399 (1960); *State* v. *Serkau*, 128 Conn. 153, 157–58, 20 A.2d 725 (1941); see also W. LaFave & A. Scott, Criminal Law (1972) § 89, pp. 649–50; 26 Am. Jur. 2d 362, Embezzlement § 6 (1996).

We take up first the larceny by embezzlement as concerns the corporate entity, i.e., HF, Inc. A corporation is a separate legal entity, separate and apart from its stockholders. See *State* v. *Harris*, supra, 147 Conn. 593; *Humphrey* v. *Argraves*, 145 Conn. 350, 354, 143 A.2d 432 (1958); *Hoffman Wall Paper Co.* v. *Hartford*, 114 Conn. 531, 534, 159 A. 346 (1932). "The property of the corporation was not [the defendant's], regardless

of who owned the corporate stock." *State* v. *Harris*, supra, 593. "It is an elementary principle of corporate law that a corporation and its stockholders are separate entities and that the title to the corporate property is vested in the corporation and *not* in the owner of the corporate stock. *Moline Properties, Inc.* v. *Commissioner*, 319 U.S. 436, 63 S. Ct. 1132, 87 L. Ed. 1499 (1943) . . . ." (Emphasis in original.) *Monterey Life Systems, Inc.* v. *United States*, 635 F.2d 821, 825 (Ct. Cl. 1980); see 1 W. Fletcher, Cyclopedia of the Law of Private Corporations (1990) § 31, p. 555. "Stockholders, even the controlling stockholder, cannot transfer or assign the corporation's properties . . . nor apply corporate funds to personal debts or objects . . . ." 1 W. Fletcher, supra, p. 556.

The defendant, by virtue of his position and conduct, had property of HF, Inc., in his care and custody. The possession concomitant with this care and custody was legal. His action concerning the property was confined to disbursements only for proper business of HF, Inc. The defendant's status, under the circumstances, was in the nature of a fiduciary. It was with such a status the defendant took to himself, for all practical purposes, the management of the affairs of HF, Inc. He had absolutely no authority on the record to act otherwise. Even though he had a sizable interest in HF, Inc., he acted wholly without corporate authority. In comporting himself as he did in making disbursements of the funds of HF, Inc., for nonbusiness purposes, including personal use, he wrongfully exercised control over the funds and appropriated them to himself. The lawful possession became, by his felonious intent in using the property of HF, Inc., as he did, the crime of larceny by embezzlement of moneys of HF, Inc., in excess of $10,000. The evidence we have set out, including his representations to Tavarozzi of the false federal and state tax payments, demonstrated the felonious intent. There was sufficient

evidence to sustain the larceny by embezzlement count as to HF, Inc., in the single count information.

Next, we turn to the larceny by embezzlement as to Tavarozzi individually. He, like the defendant, was a principal and a shareholder in HF, Inc., did not hold the title to corporate property and had a right to receive moneys from HF, Inc., where the authority to do so existed. He also had obligation to make authorized disbursements for the conduct of HF, Inc., business. Tavarozzi did have a right to possession of HF, Inc., property that was superior to that of one who was a taker, an obtainer or a withholder of that property, even if it were this defendant.

The trial court charged, without exception, as follows. "The primary element of a larceny, under the statute, is that there be a wrongful taking, obtaining or withholding of property from an owner. Taking means any wrongful taking of property away from the person entitled to it, whether by force or some other unlawful means. Obtaining means wrongfully obtaining property from another or wrongfully bringing about the transfer of a legal interest in the property from the owner to the offender, or a third person. Withholding means wrongfully keeping property from its owner. . . . [W]rongfully, as used in the statute, means without any legal justification or excuse, and it also requires that the defendant have a dishonest purpose or intention of defrauding, cheating or depriving the owner of the property. . . . To appropriate property of another to oneself or third person means to dispose of the property for the benefit of oneself or a third person."

In addition, " '[p]roperty' means any money, personal property, real property, thing in action, evidence of debt or contract, or article of value of any kind. . . ." General Statutes § 53a-118 (a) (1). Our definitional provision in part IX of chapter 952 of the General Statutes,

which covers "Larceny, Robbery and Related Offenses," does not, however, contain any definition of "property of another." That phrase is included in the crime of larceny by embezzlement in General Statutes § 53a-119 (1), which provides that "[a] person commits larceny when he wrongfully appropriates to himself or to another *property of another* in his care or custody." (Emphasis added.) Given the unusual circumstances disclosed by the evidence, a well-turned and appropriately expressed definition of that phrase will aid our analysis. Although Tavarozzi did not, as the defendant did not, have legal title to the property of HF, Inc., we believe that, under the circumstances, he had a "right to possession [of the property, i.e., the assets] *superior* to that of a taker, obtainer or withholder"; (emphasis added) General Statutes § 53a-118 (a) (5); that is, the defendant. It is axiomatic in the theory underlying larceny that "ownership" may include possessory rights. *People* v. *Izzo*, 96 Misc.2d 634, 635, 409 N.Y.S.2d 623 (1978). The centralization of ownership or management of a close corporation, such as HF, Inc., is not a carte blanche to abrogate proper procedures. See *In re County Green Ltd. Partnership*, 438 F. Sup. 701, 707 (W.D. Va. 1977), rev'd on other grounds, 604 F.2d 289 (4th Cir. 1979); 18A Am. Jur. 2d 617, Corporations § 747 (1985). Even though the defendant might have been entitled, employing proper procedures, to expect, as agreed, a salary from HF, Inc., that hardly gave him the right to deal feloniously with the funds of HF, Inc., as he did.[18] It is significant that the embezzlement results from the application of the defendant's wrongful conduct to the property of another that came into his possession lawfully but on which he now has acted wrongfully. See *State* v. *Lizzi*, supra, 199 Conn. 467;

---

[18] The defendant testified at length in his own defense, including his drawing of checks on HF, Inc. It is apparent that the jury rejected his explanation of his "authority" to act as he did.

*State* v. *Bettini*, 11 Conn. App. 684, 688, 528 A.2d 1180, cert. denied, 205 Conn. 804, 531 A.2d 937 (1987).

We find support for this conclusion under our statutory scheme and accepted referents in its interpretation. Our statutes, as noted, define "owner" and "property" but not "property of another." Our Supreme Court has pointed out that "[t]he drafters of the [Connecticut penal] code relied heavily upon the Model Penal Code and various state criminal codes, especially the penal code of New York." (Internal quotation marks omitted.) *State* v. *Havican*, 213 Conn. 593, 601, 569 A.2d 1089 (1990); *State* v. *Hill*, 201 Conn. 505, 516–17, 523 A.2d 1252 (1986). We may turn to statutory provisions of such codes for guidance in a proper case even though we are aware that similarity of language does not compel a like construction. See *State* v. *Havican*, supra, 601; *State* v. *Hill*, supra, 517. Accordingly, we turn to a well considered definition of the "property of another" that is found in the A.L.I., Model Penal Code and Commentaries (1980) § 223.0 (7) p. 125.

The penal code definition provides in relevant part that " 'property of another' includes property in which any person other than the actor has an interest which the actor is not privileged to infringe, regardless of the fact the actor also has an interest in the property . . . ."[19] The comment to § 223.0 (7) in the Model Penal Code that "property of another" includes any property

[19] Section 223.0 (7) of the Model Penal Code provides: " 'property of another' includes property in which any person other than the actor has an interest which the actor is not privileged to infringe, regardless of the fact that the actor also has an interest in the property and regardless of the fact that the other person might be precluded from civil recovery because the property was used in an unlawful transaction or was subject to forfeiture as contraband. Property in possession of the actor shall not be deemed property of another who has only a security interest therein, even if legal title is in the creditor pursuant to a conditional sales contract or other security agreement."

"in which any person other than the actor has an interest which the actor is not privileged to infringe" is instructive. It states that "[o]bviously, this concept includes any ownership or possessory interest of another. Also included are the various relations of trust that can lead to traditional liability for embezzlement." Id., 168.

The funds of HF, Inc., that the defendant embezzled included moneys in which Tavarozzi had an interest and on which the defendant was not privileged to infringe even considering that the defendant had an interest in them but for his misappropriations. Tavarozzi could appropriately look to such funds as the basis for profits, distributions, salary and the like when they were disbursed or declared by proper corporate action. The defendant was not privileged to infringe on such interests of Tavarozzi.

Webster's definitions of "infringe" include "destroy," "defeat" and "transgress." Webster's Third New International Dictionary. The penal code definition of "property of another" has salutary relevance to our statutory scheme of larceny in all its aspects of advancing the efforts of criminal law to deter the impairment of the economic interests of other people. See Model Penal Code and Commentaries, supra, p. 170. Years ago, albeit under somewhat different factual circumstances but with no difference in principle, our Supreme Court held that an agent could be convicted of embezzling a fund even when he was entitled to a part of it as a commission for collection. In doing so, that court said: "The weight of modern authority and every consideration of public policy support the view that a conviction of embezzlement can be had under these circumstances . . . . There is no difference in principle when the agent embezzles the major part of the fund [before his principal has exercised his right to the fund less the agent's commission], though he is entitled to a small percentage

of it as commission." (Citations omitted.) *State* v. *McNamara*, 128 Conn. 273, 277, 22 A.2d 10 (1941). It is our view that the jury could also have properly found on the evidence that the defendant was guilty as charged as to Tavarozzi. The evidence was sufficient to support that conclusion.

## III

The defendant next claims that the joinder of the two informations,[20] including the Chicoski-Sandoval and Tavarozzi larcenies, constituted an abuse of discretion by the trial court so that his convictions must be set aside and remanded for a new trial. In doing so, he contends that he was substantially prejudiced by the duration and complexity of the consolidated trial, the lack of curative instructions and the overlapping factual scenarios, which were "discrete, easily distinguishable factual scenarios," and that the Tavarozzi larceny and Chicoski-Sandoval larceny were legally unrelated and would not have been admitted as similar misconduct in separate trials. We do not agree.

Our review of this claim involves the question of whether the trial court abused its discretion in failing to conclude that the defendant would suffer "substantial injustice" if the larceny charges were consolidated and adjudicated in the same trial. See *State* v. *Chance*, 236 Conn. 31, 37, 671 A.2d 323 (1996); *State* v. *Boscarino*, 204 Conn. 714, 721, 529 A.2d 1260 (1987). "It is clear . . . that the presumption is in favor of joinder and against severance. Only when joinder will work a substantial injustice should a trial court sever the charges." *State* v. *Jones*, 234 Conn. 324, 344, 662 A.2d 1199 (1995).

---

[20] We consider this claim as including the four counts of forgery for which the defendant also claims there was no subject matter jurisdiction. See part IV of this opinion.

"Substantial prejudice is more than disadvantage and the formidable task of demonstrating an abuse of discretion and that a joint trial resulted in substantial prejudice falls to the defendant." (Internal quotation marks omitted.) Id., 343; see *State* v. *Smith*, 201 Conn. 659, 669, 519 A.2d 26 (1986). Consistent with this heavy burden, the defendant must "show that the denial of severance resulted in substantial injustice because of a manifest abuse of discretion in denying severance." (Internal quotation marks omitted.) *State* v. *Chance*, supra, 38, and cases cited therein. "In this context, 'prejudice means more than just a better chance of acquittal at a separate trial.' [*United States* v. *Martinez*, 479 F.2d 824, 828 (1st Cir. 1973)]." *United States* v. *Boylan*, 898 F.2d 230, 246 (1st Cir.), cert. denied, 498 U.S. 849, 111 S. Ct. 139, 112 L. Ed. 2d 106 (1990). The defendant's burden also includes a showing that the " 'denial of severance resulted in substantial injustice,' and that any resulting prejudice was 'beyond the curative power of the court's instructions.' " *State* v. *Boscarino*, supra, 721, quoting *State* v. *King*, 187 Conn. 292, 302, 445 A.2d 901 (1982); see *State* v. *Chance*, supra, 38; *State* v. *Herring*, 210 Conn. 78, 95, 554 A.2d 686, cert. denied, 492 U.S. 912, 109 S. Ct. 3230, 106 L. Ed. 2d 579 (1989); *State* v. *Quinones*, 21 Conn. App. 506, 512, 574 A.2d 1308, cert. denied, 215 Conn. 816, 576 A.2d 546 (1990).

"In assessing prejudice, a reviewing court should consider factors such as (1) whether the charges involved discrete, easily distinguishable factual scenarios; (2) whether the crimes were of a violent nature or concerned brutal or shocking conduct on the defendant's part; and (3) the duration and complexity of the trial. . . . [I]f any or all of these factors were present, a reviewing court would have to decide whether the trial court's jury instructions cured any prejudice that might have occurred." (Citations omitted; internal quotation marks omitted.) *State* v. *Horne*, 215 Conn. 538, 547, 577

A.2d 694 (1990); *State* v. *Herring,* supra, 210 Conn. 95; see *State* v. *Boscarino,* supra, 204 Conn. 721; *State* v. *Stevenson,* 43 Conn. App. 680, 686, 686 A.2d 500 (1996), cert. denied, 240 Conn. 920, 692 A.2d 817 (1997); *State* v. *Snead,* 41 Conn. App. 584, 587, 677 A.2d 446 (1996). In considering the issue of the propriety of joinder, we are aware of the undeniable tension between the need to conserve judicial resources by consolidating cases and the defendant's right to a fair trial. See *State* v. *Herring,* supra, 95.

We look first to whether the charges that the defendant claims were improperly consolidated involved "discrete, easily distinguishable factual scenarios." Initially, we note that the defendant claims that, "[a]lthough there was a significant amount of overlapping factual evidence of the two larcenies [the Chicoski-Sandoval larceny and the Tavarozzi larceny], the nature of the two larcenies was sufficiently distinct to present the danger of significant prejudice and confusion by consolidation of the two larcenies." He states, however, that "the overlapping evidence was extraordinarily difficult to parse out and apply to the separate charges," as well as saying that "the confusing fact pattern made it likely that the jury used evidence of the Chicoski-Sandoval larceny to convict on the Tavarozzi larceny, and evidence of the Tavarozzi larceny to convict on the Chicoski-Sandoval larceny." The facts in the Tavarozzi larceny charges were sufficiently related to the Chicoski-Sandoval larceny charges in the other information so that a number of those facts would have been admissible in the Tavarozzi case. For example, the defendant was the bookkeeper controller not only of HFCT but also of HFMA before he secretly took part in the proposal to buy the assets of HFCT from Chicoski and Sandoval. In that position, he generated the misleading financial statements of the dire fiscal condition of HFCT that influenced Chicoski and Sandoval to sell HFCT to

the group headed by Tavarozzi. The latter had worked not only in Massachusetts for HFMA and HFCT but also later in Connecticut for HFCT where he came to know the defendant better. The defendant put the package together that was presented to Chicoski and Sandoval by Tavarozzi, who negotiated with Chicoski, and the defendant did this while he siphoned moneys from HFCT before the purchase. The evidence was reasonably amenable to the interpretation that a large part of the moneys that the defendant, as the silent man in that sale, made available toward the purchase of HFCT came from funds he had systematically drained from HFCT. This is, in broad terms, how the defendant got in position to enact his scheme of embezzling from HF, Inc., the successor to HFCT, and to embark on the TRE phase of his common scheme of embezzlement. Significantly, the trial court, in its final instructions to the jury, said that these crimes charged under § 53a-121 (b) were alleged by the state to have been committed "pursuant to one scheme or course of conduct." There was no exception to that by the defendant. Moreover, the state produced evidence, which it could have produced at separate trials, of prior felony convictions[21]

[21] In this case the defendant testified at length on his own behalf about the crimes with which he was charged. His claims before us do not present the issue, made in some severance cases, that consolidation prevented him from testifying as to some charges and not others. In that context, one court has said: "[N]o need for a severance exists until the defendant makes a convincing showing that he has both important testimony to give concerning one count and strong need to refrain from testifying on the other. In making such a showing, it is essential that the defendant present enough information—regarding the nature of the testimony he wishes to give on one count and his reasons for not wishing to testify on the other—to satisfy the court that the claim of prejudice is genuine and to enable it intelligently to weigh the considerations of 'economy and expedition in judicial administration' against the defendant's interest in having a free choice with respect to testifying." (Internal quotation marks omitted.) *United States* v. *Cox*, 934 F.2d 1114, 1120 (10th Cir. 1991), quoting *United States* v. *Valentine*, 706 F.2d 282, 291 (10th Cir. 1983); see *State* v. *Marsala*, 43 Conn. App. 527, 535–36, 684 A.2d 1199 (1996), cert. denied, 239 Conn. 957, 688 A.2d 329 (1997).

and prior uncharged misconduct. When the defendant testified, two prior felony convictions were introduced. "Such evidence is admissible . . . to prove . . . intent . . . and common scheme or design, if the trial court determines, in the exercise of judicial discretion, that the probative value of the evidence outweighs its prejudicial tendency." *State* v. *Lizzi*, supra, 199 Conn. 468; *State* v. *Vessichio*, 197 Conn. 644, 664, 500 A.2d 1311 (1985), cert. denied, 475 U.S. 1122, 106 S. Ct. 1642, 90 L. Ed. 2d 187 (1986). Mark Breen, who gave prior uncharged misconduct evidence, was the owner of Century Development Corporation, which had employed the defendant as an accountant. Breen testified that during that employment, improprieties arose, forged signatures were discovered, and the defendant was being paid money to which he was not entitled. Breen terminated the defendant's employment with Century Development Corporation. "[Prior misconduct] evidence may also be used to corroborate crucial prosecution testimony. . . . Moreover, we have held that such evidence may be used to complete the story of the crime on trial by placing it in the context of . . . nearly contemporaneous happenings." (Citations omitted; internal quotation marks omitted.) *State* v. *Cooper*, 227 Conn. 417, 424–25, 630 A.2d 1043 (1993). The trial court, at the outset of the trial, during the trial and in its final instruction, carefully informed the jury that it was to consider each information and each charge separately in arriving at a verdict on each charge. In addition, it took pains to point out that the evidence as to the corporations involved must each be considered carefully and separately. The defendant has not sustained his burden on that factor.

Next, we consider whether the crimes charged were of a violent nature or concerned brutal or shocking conduct on the defendant's part. See *State* v. *Chance*, supra, 236 Conn. 42; *State* v. *Jennings*, 216 Conn. 647,

658, 583 A.2d 915 (1990); *State* v. *Boscarino*, supra, 204 Conn. 723. Where one case does involve such conduct, we must consider whether that conduct "is apt to arouse the passion of the jury against him to such an extent that they probably would not give fair consideration to the evidence relating to the other charges." *State* v. *Silver*, 139 Conn. 234, 240–41, 93 A.2d 154 (1952); *State* v. *Chance*, supra, 42; *State* v. *Boscarino*, supra, 723; *State* v. *King*, supra, 187 Conn. 299–300. It is more than fair to say that the consolidation of the two informations had little prejudicial impact on the defendant in his defense of the single count Tavarozzi larceny information. This factor must be resolved in the state's favor.

We next examine the defendant's claim that he was substantially prejudiced by the duration and complexity of the consolidated trial. We are aware that the duration and complexity of a consolidated trial may enhance the likelihood that jury may weigh the evidence against the defendant cumulatively, rather than independently in each case. See *State* v. *Boscarino*, supra, 204 Conn. 723–24 (approximately ten weeks of testimony by fifty-five witnesses constituted undue duration and complexity); see also *State* v. *Jennings*, supra, 216 Conn. 660; cf. *State* v. *Herring*, supra, 210 Conn. 97 (no undue duration or complexity in eight days of testimony by twenty-three witnesses in consolidated cases where, in first case, defendant charged with crimes of murder and conspiracy to commit murder and, in second case, with crimes of murder and felony murder). The circumstances of each case must be considered where consolidation is claimed to result in a substantial prejudice.

The defendant's trial covered nine days[22] from the date the jury was sworn in until its verdict was reached.

[22] The defendant's trial did not last "four weeks" as his brief claims. Pretrial motions and jury selection consumed a number of days before evidence was presented before the jury.

Some nineteen witnesses testified. There were hundreds of checks and a number of documents introduced as exhibits. The trial did involve four separate corporations, HFCT, HFMA, HF, Inc., and HFNE,[23] and there was a large number of exhibits. Because the larcenies involved embezzlement and forgery carried out systematically in the siphoning off of thousands of dollars, evidence of the considerable paper trail was necessary to substantiate vital aspects of the state's case.

The trial court endeavored to aid the jury in the matter of understanding the evidence. For example, on one occasion, over the state's objection, it told the jury that at that point Tavarozzi was beginning to testify about the single count larceny information. On another occasion, it admitted, as an aid to the jury, a chart showing a number of corporate checks that the state claimed were unauthorized.[24] The defendant cannot simply claim jury confusion, but "must demonstrate that the jury was unable to compartmentalize the evidence . . . ." *United States* v. *Adkins*, 842 F.2d 210, 212 (8th Cir. 1988); see *United States* v. *Lee*, 886 F.2d 998, 1002 (8th Cir. 1989), cert. denied, 493 U.S. 1032, 110 S. Ct. 748, 107 L. Ed. 2d 765, cert. denied, 495 U.S. 906, 110 S. Ct. 1926, 109 L. Ed. 2d 290 (1990). The defendant has not demonstrated this. Moreover, "we have no reason to believe that the jury lacked the intellectual capacity to meet the task before it." *United States* v. *Casamento*, 887 F.2d 1141, 1150 (2d Cir. 1989), cert. denied, 493 U.S. 1081, 110 S. Ct. 1138, 107 L. Ed. 2d 1043 (1990). A fair reading of the trial transcript shows that the state presented its evidence in an orderly fashion so as to work to mitigate potential complexity and risk of juror confusion. See *State* v. *Jennings*, supra,

---

[23] The evidence concerning HFNE was minuscule.

[24] Prior to admitting this chart, the trial court excluded another chart offered by the state, also going to the flow of corporate money, to show that at least some of the checks were apparently unauthorized.

216 Conn. 660. Finally, in claiming that the state made the case more complex by presenting the evidence of Breen, the defendant fails to mention the careful instructions of the trial court, given both when it was admitted and during its final instructions, of the "limited purpose" for which the evidence was admitted. We cannot accept the defendant's claims concerning the duration and complexity factor; that factor must be resolved in the state's favor.

Finally, we have already referred to the significance of a trial court's instructions in alleging the matter of prejudice that might be the result of consolidation. In this case, the trial court pointed out during voir dire that trial did involve two separate informations. It described in detail the allegations of each count, and said that "each one of these charges must be considered separately, and in each information separately as well." When the jury had been selected and sworn and after the clerk had read in full each count in both informations, the trial court, in its remarks, included the following: "Each charge against the defendant is set forth on the informations in a separate paragraph or count, and each offense charged must be considered separately by you in deciding the guilt or innocence of the defendant." About midway during the trial and during Tavarozzi's direct testimony, the trial court, reminding the jury that "just before the evidence began, [the trial court indicated] that there were two separate informations, one in six counts, the other in one count," again addressed the jury. At that time, to preserve clarity, it said: "Mr. Tavarozzi now has been testifying about a larceny first charge . . . which is contained in a one count information which involved [HF, Inc.], as opposed to the larceny first which involved [HFCT] and [HFMA]." During its final instructions to the jury, it charged in detail on the three larceny counts, which corporations were involved

in each and that each of the three larcenies were separate. In doing so, it said: "And, of course, remember that each count must be considered by you separately when you deliberate."[25] It charged similarly as to the four forgery counts. Later, it reminded the jury that it would have to render a separate verdict on each of the counts.

"Barring contrary evidence [and there is none], we must presume that juries follow the instructions given them by the trial judge." *United States* v. *Casamento,* supra, 887 F.2d 1151; *State* v. *Horne,* supra, 215 Conn. 551; *State* v. *Rouleau,* 204 Conn. 240, 254, 528 A.2d 343 (1987); *State* v. *Williams,* supra, 202 Conn. 363–64; *State* v. *Guess,* 39 Conn. App. 224, 235, 665 A.2d 126, cert. denied, 235 Conn. 924, 666 A.2d 1187 (1995). "This presumption is 'rooted less in the absolute certitude that [it] is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process.' [*Richardson* v. *Marsh,* 481 U.S. 200, 211, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987)]." *United States* v. *Casamento,* supra, 1151. Under the circumstances, the trial court's instructions minimized any risk of prejudice that might have been caused by the consolidation of the two informations.

We conclude that the defendant has not sustained his burden on the consolidation claim. The consolidation of the informations did not result in substantial prejudice, and the trial court did not abuse its discretion in granting the state's motion for consolidation.

IV

The defendant next claims that his conviction on the four forgery counts must be set aside because his

---

[25] During its final instructions, the court also charged in detail on the charges of forgery, saying that "each of these counts must be considered separately."

prosecution by the state violated the supremacy clause[26] of the United States Constitution as that prosecution has been preempted by federal tax legislation. Invoking the United States Supreme Court's decision in *Pennsylvania* v. *Nelson*, 350 U.S. 497, 76 S. Ct. 477, 100 L. Ed. 640 (1956), he contends that applying the *Nelson* analysis to the forgery convictions makes it clear that his prosecutions on those charges are preempted. Arguing that the federal government has the exclusive interest in the regulation of federal income taxation, the defendant claims that the Internal Revenue Code is so pervasive as "to indicate its exclusive intent to regulate matters pertaining to federal income taxation." He therefore claims that state enforcement in this case will hamper the uniform enforcement of laws relating to federal income tax by the federal government. In addition, he maintains that the IRS, with whom the allegedly forged documents were required by federal law to be filed, does not constitute a "public office" or a "public servant" under the Connecticut forgery statute in General Statutes § 53a-139 (a) (2). Finally, the defendant argues that the erroneous submission of the four counts of forgery "further prejudiced the jury's consideration of the other charges against [him], requiring reversal of all of his convictions." We do not agree.

In *Times Mirror Co.* v. *Division of Public Utility Control*, 192 Conn. 506, 510–12, 473 A.2d 768 (1984), our Supreme Court said: "The question of preemption is one of federal law, arising under the supremacy clause of the United States constitution. U.S. Const., art VI. As the United States Supreme Court has recently reiterated, state law can be preempted in either of two general ways. If Congress evidences an intent to occupy

---

[26] The supremacy clause of the United States constitution provides: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby . . . ." U.S. Const., art. VI.

a given field, any state law falling within that field is preempted. [*Pacific Gas & Electric Co.* v. *State Energy Resources Conservation & Development Commission*, 461 U.S. 190, 203, 103 S. Ct. 1713, 75 L. Ed. 2d 752 (1983)]; *Fidelity Federal Savings & Loan Ass'n.* v. *de la Cuesta*, 458 U.S. 141, 153 [102 S. Ct. 3014, 73 L. Ed. 2d 664] (1982); *Rice* v. *Santa Fe Elevator Corp.*, 331 U.S. 218, 230 [67 S. Ct. 1146, 91 L. Ed. 1447] (1947). If Congress has not entirely displaced state regulation over the matter in question, state law is still preempted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U.S. 132, 142–43 [83 S. Ct. 1210, 10 L. Ed. 2d 248, reh. denied, 374 U.S. 858, 83 S. Ct. 1861, 10 L. Ed. 2d 1082] (1963), or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress. *Hines* v. *Davidowitz*, 312 U.S. 52, 67 [61 S. Ct. 399, 85 L. Ed. 581] (1941). *Silkwood* v. *Kerr-McGee Corporation*, 464 U.S. 238, 248, 104 S. Ct. 615, 78 L. Ed. 2d 443 (1984). . . .

"In the determination of whether state law has been preempted, the Supreme Court of the United States has in recent years retreated from its earlier view that there was no room for any state regulation of matters already regulated by the federal government. See L. Tribe, American Constitutional Law [(1978) § 6-23], pp. 377–79. State law is today preempted only to the extent necessary to protect the achievement of the aims of the federal law. *De Canas* v. *Bica*, 424 U.S. 351, 357–58 n.5, 96 S. Ct. 933, 47 L. Ed. 2d 43 (1976); *Merrill Lynch, Pierce, Fenner & Smith* v. *Ware*, 414 U.S. 117, 127, 94 S. Ct. 383, 38 L. Ed. 2d 348 (1973)." (Internal quotation marks omitted.) "State laws are preempted only when their operation expressly conflicts with the laws of the United States. *McClellan* v. *Chipman*, 164 U.S. 347, 356–57, 17 S. Ct. 85, 41 L. Ed. 461 (1896); *Shea* v. *First*

*Federal Savings & Loan Assn. of New Haven,* 184 Conn. 285, 292–93, 439 A.2d 997 (1981)." *Normand Josef Enterprises, Inc.* v. *Connecticut National Bank,* 230 Conn. 486, 517, 646 A.2d 1289 (1994).

In *Pennsylvania* v. *Nelson,* supra, 350 U.S. 497, the United States Supreme Court set out a three-pronged test for determining the preemption issue. "First, '[t]he scheme of federal regulation [must be] so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it' "; id., 502; "[s]econd, the federal [statute must] 'touch a field in which the federal interest is so dominant that the federal system [must] be assumed to preclude enforcement of state laws on the same subject' "; id., 504; "[t]hird, enforcement of state [legislation must present] a serious danger of conflict with the administration of the federal program." Id., 505; see *Shea* v. *First Federal Savings & Loan of New Haven,* supra, 184 Conn. 293. In addressing preemption, the United States Supreme Court has said that "[i]f Congress is authorized to act in a field, it should manifest its intention clearly. It will not be presumed that a federal statute was intended to supersede the exercise of the power of the state unless there is a clear manifestation of intention to do so. The exercise of federal supremacy is not lightly to be presumed. *Schwartz* v. *Texas,* 344 U.S. 199, 202–203, [73 S. Ct. 232, 97 L. Ed. 231] (1952)." (Internal quotation marks omitted.) *New York State Dept. of Social Services* v. *Dublino,* 413 U.S. 405, 413, 93 S. Ct. 2507, 37 L. Ed. 2d 688 (1973); see *Maryland* v. *Louisiana,* 451 U.S. 725, 746–47, 101 S. Ct. 2114, 68 L. Ed. 2d 576 (1981); see *Shea* v. *First Federal Savings & Loan Assn. of New Haven,* supra, 292. Moreover, preemption is not "to be inferred merely from the comprehensive character of the federal [legislation]." *New York State Dept. of Welfare Services* v. *Dublino,* supra, 415; *R.J. Reynolds Tobacco Co.* v. *Durham County,* 479 U.S. 130, 149, 107

S. Ct. 499, 93 L. Ed. 2d 449 (1986); *Grocery Mfrs. of America, Inc.* v. *Dept. of Public Health,* 379 Mass. 70, 81, 393 N.E.2d 881 (1979).

In deciding the issue of preemption, it is crucial to determine the intent of Congress to ascertain whether the state statute violated the supremacy clause of the United States constitution and is, therefore, invalid. See *California Federal Savings & Loan Assn.* v. *Guerra,* 479 U.S. 272, 280, 107 S. Ct. 683, 93 L. Ed. 2d 613 (1987). "An act may be made a crime by both state and federal legislation." *State* v. *Scarano,* 149 Conn. 34, 39, 175 A.2d 360 (1961); *Hoxie* v. *New York, N. H. & H. R. Co.,* 82 Conn. 352, 365, 73 A. 754 (1909); see *State* v. *Moeller,* 178 Conn. 67, 71, 420 A.2d 1153, cert. denied, 444 U.S. 950, 100 S. Ct. 423, 62 L. Ed. 2d 320 (1979). Under the doctrine of "dual sovereignty" the same act may be an offense or transgression against both sovereigns and may be punished by each. See *California* v. *Zook,* 336 U.S. 725, 731, 69 S. Ct. 841, 93 L. Ed. 1005 (1949); *United States* v. *Lanza,* 260 U.S. 377, 382, 43 S. Ct. 141, 67 L. Ed. 314 (1922); *State* v. *McKenna,* 188 Conn. 671, 677 n.13, 453 A.2d 435 (1982); *State* v. *Moeller,* supra, 178 Conn. 70–71; *State* v. *Scarano,* supra, 149 Conn. 40–41. The United States Supreme Court "has clearly placed the burden on the proponent of federal preemption to state a strong case . . . ." *Druker* v. *Sullivan,* 334 F. Sup. 861, 862 (D. Mass. 1971), aff'd, 458 F.2d 1272 (1st Cir. 1972), citing *Florida Lime & Avocado Growers* v. *Paul,* supra, 373 U.S. 142. It is instructive to point out that "[our] Superior Court has jurisdiction of all matters expressly committed to it and of all other judicially cognizable matters not within the exclusive jurisdiction of another court. *Carten* v. *Carten,* 153 Conn. 603, 612, 219 A.2d 711 (1966)." *Shea* v. *First Federal Savings & Loan Assn. of New Haven,* supra, 184 Conn. 290. Jurisdiction for any violation of our forgery statute in General Statutes § 53a-138 et seq. is specifically within the

jurisdiction of our Superior Court. As the United States Supreme Court said, the " 'question whether Congress and its commissions acting under it have so far exercised the exclusive jurisdiction that belongs to it as to exclude the State, must be answered by a judgment upon the particular case.' Statements concerning the 'exclusive jurisdiction' of Congress beg the only controversial question: whether Congress intended to make its jurisdiction exclusive." *California* v. *Zook,* supra, 336 U.S. 731, quoting *Pennsylvania R. Co.* v. *Public Service Commission,* 250 U.S. 566, 569, 40 S. Ct. 36, 63 L. Ed. 1142 (1919).

Federal law may preempt state law when Congress, acting within constitutional limitations, does so by so stating in express terms or by what is "implicitly contained in its structure and purpose." *Jones* v. *Rath Packing Co.*, 430 U.S. 519, 525, 97 S. Ct. 1305, 51 L. Ed. 2d 604 (1977). The defendant has not referred to any federal statute that expressly preempts this state's prosecution of the forgery charges in this case. As we will discuss, 18 U.S.C. § 3231, which confers original jurisdiction upon the district courts "of all offenses against the laws of the United States," does not, in our view, in this case operate as to preempt expressly our forgery statute in § 53a-138 et seq.

It has been said that "[s]ince the Federal Criminal Code confers upon the District Courts of the United States original jurisdiction, exclusive of state courts, of 'all offenses against the laws of the United States,' such courts by virtue of such provision of course have original and exclusive jurisdiction of prosecutions for offenses against the tax laws of the United States, or more specifically, in violation of the Internal Revenue Code." 35 Am. Jur. 2d 175, Federal Tax Enforcement § 125 (1967). Under 18 U.S.C. § 3231, "[t]he district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses

against the laws of the United States. Nothing in this title shall be held to take away or impair the jurisdiction of the courts of the several States under the laws thereof." The defendant suggests that this section of the United States Code, which denominates the federal jurisdictional predicate for those federal crimes, i.e., 26 U.S.C. 7206 (fraud and false statements) and § 7207 (fraudulent returns, statements or other documents), preempts the state prosecution of the forgery charges in this case. Both of those sections provide for imprisonment or fines or both. The defendant maintains, citing 26 U.S.C. §§ 7801 through 7805, that the "administration" of the federal tax code is exclusively the responsibility of Congress and the IRS, and that "federal courts and U.S. tax courts have exclusive jurisdiction over all criminal and civil actions involving federal tax laws," referring to "26 U.S.C. § 7401 et seq.; 28 U.S.C. § 1340."[27] He does not, however, point to any specific language in any of these sections that appears to remove from the district courts the jurisdiction given them over "all offenses against the laws of the United States."[28]

There can be little, if any, question that the Internal Revenue Code is a most comprehensive regulatory code, both in its statutory and regulatory aspects. As is almost any complex federal statute, it is national in its application and impact. Despite the complex statutory and regulatory scheme of the code, the subjects of certain regulation "often by their very nature require intricate and complex responses from the Congress, but without Congress necessarily intending its enactment as the exclusive means of meeting the problem." (Internal quotation marks omitted.) *Hillsborough County* v. *Automated Medical Labs, Inc.*, 471 U.S. 707,

---

[27] We note that 26 U.S.C. § 7401 and 28 U.S.C. § 1340 each apply to a "civil action."

[28] We recognize that the code elsewhere, i.e., 26 U.S.C. §§ 7206 and 7207, applies to the alleged forgery offenses.

717, 105 S. Ct. 2371, 85 L. Ed. 2d 714 (1985). Moreover, Connecticut has a legitimate interest in enforcing its criminal statutes. In this case, the state, in our view, is not transgressing any specific statutory provision of the code nor any regulation under it. We do not infer any congressional intent to make "[t]he scheme of federal regulation . . . *so pervasive* as to make reasonable [any] inference that Congress left no room for the States to supplement it." (Emphasis added; internal quotation marks omitted.) *Pennsylvania* v. *Nelson*, supra, 350 U.S. 502. Webster defines "pervasive" as that which tends to be dominant. Webster's Third New International Dictionary. The term "pervasive" fairly conveys the perception of that which affects entirely or that which is inextricably intertwined with all that it affects. We do not find that to be expressly so vis-a-vis the propriety of the state's prosecuting the four forgery charges in this case even though the forgery was committed on federal tax forms. The Internal Revenue Code has been supplemented by comprehensive regulations, none of which the defendant has referred to as bearing on the narrow issue before us. Such control, we submit, does still leave room for the state, in this case, to prosecute the forgery charges under our state statute. It is not that pervasive as applied to this case. To say, absent an express preemption statement, that whenever there is an admittedly comprehensive dealing with a subject by federal regulation that that regulation is exclusive would be inconsistent with the federal-state balance embodied in the supremacy clause. See *Hillsborough County* v. *Automated Medical Labs, Inc.*, supra, 717; *Jones* v. *Rath Packing Co.*, supra, 430 U.S. 525. Even 18 U.S.C. § 3231, the applicable jurisdictional statute, provides in part that "[n]othing in this title shall be held to take away or impair the jurisdiction of the courts of the several States under the laws thereof." This language recognizes that there may be circumstances even

where, under the doctrine of dual sovereignty, each sovereign has enacted a statute on the subject, in which state jurisdiction to proceed will be appropriate. See *State* v. *Scarano*, supra, 149 Conn. 41.

Here, the crime at issue is forgery. In pursuing that charge in this particular case, the state is not at all trenching upon the IRS' pursuit of the code violations by the defendant. The IRS, as the witness Reheault explained, was pursuing the violations by its filing of tax liens and assessment of penalties. It chose not to proceed, although it could have, on the forgery and specifically not on 26 U.S.C. §§ 7206 and 7207.[29] The state's legitimate interest in enforcing its forgery statute is not at all incompatible with the federal regulatory scheme in this instance.

In finding that to be so in this case, we are aware that "in those areas where Congress has not completely displaced state regulation, federal law may nevertheless pre-empt state law to the extent it actually conflicts with federal law. Such a conflict occurs either because 'compliance with both federal and state regulations is a physical impossibility' . . . or because the state law stands 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" (Citation omitted.) *California Federal Savings & Loan Assn.* v. *Guerra*, supra, 479 U.S. 281; see *General Motors Corp.* v. *Abrams*, 897 F.2d 34, 40 (2d Cir. 1990); *Dept. of Labor & Industry* v. *Common Carriers*, 111 Wash. 2d 586, 588, 762 P.2d 348 (1988). It is apparent that "dual compliance" is not physically impossible in this case. Furthermore, the defendant has not pointed to any actual conflict with federal law. In addition, one commentator properly points out that the United States

---

[29] 26 U.S.C. §§ 7206 and 7207 are both criminal statutes. The former concerns fraud and false statements, and the latter concerns fraudulent returns and statements to the secretary of the treasury.

Supreme Court expresses "reluctance to find that state law interferes with the 'full purposes and objectives of Congress' [as well as saying that] [a]ny obstacles that the state sets up must be fairly high before the Court will infer preemption." 2 R. Rotunda & J. Nowak, Treatise on Constitutional Law (2d Ed. 1992) § 12.4, p. 88. We conclude that the defendant has not sustained his burden on the issue of preemption.

There remains, on this branch of the case, the defendant's claim that the IRS, with which the federal tax Form 941 is to be filed, "is not a public office or public servant" under our forgery statute. See General Statutes § 53a-139 (a) (2).[30] We do not agree.

The defendant argues that "public office" and "public servant" are not defined in the penal code[31] or anywhere else in the Connecticut statutes, and that the clear intent of "public office" as used elsewhere in our statutes is limited specifically to state, local and municipal offices. He then refers to five statutes, all civil, none of which defines "public office." This is not particularly helpful in considering this criminal statute.

Our Supreme Court has said that "[a]lthough we recognize the fundamental principle that criminal statutes are to be construed strictly, 'it is equally fundamental that the rule of strict construction does not require an interpretation which frustrates an evident legislative intent. *State* v. *Belton*, 190 Conn. 496, 505–506, 461 A.2d 973 (1983); *State* v. *Roque*, 190 Conn. 143, 151, 460 A.2d 26 (1983); *State* v. *Sober*, 166 Conn. 81, 91, 347 A.2d 61 (1974).' " *State* v. *Dolphin*, 203 Conn. 506, 523–24, 525 A.2d 509 (1987). "[T]he application of common sense

[30] See footnote 2.

[31] The term "public servant" is defined for purposes of part XI of chapter 952 of the penal code. While part X of chapter 952, which covers "Forgery and Related Offenses," also has its own definition section, i.e., General Statutes § 53a-137, that section does not define "public servant."

to the language of a penal law is not be excluded in a way which would involve absurdity or frustrate the evident design of the lawgiver." *State* v. *Pastet*, 169 Conn. 13, 21–22, 363 A.2d 41, cert. denied, 423 U.S. 937, 96 S. Ct. 297, 46 L. Ed. 2d 270 (1975); see *State* v. *Belton*, supra, 190 Conn. 506. The commission comment on part X of chapter 952 of the General Statutes, which includes our forgery statute, states in part: "[T]his section adopts a comprehensive definition in specifying what may be the subject of forgery. 'Written instrument' encompasses every kind of document and other items deemed susceptible of 'deceitful' use in a 'forgery' sense, the main requirement being that it be 'capable of being used to the advantage or disadvantage of some person' . . . ." Commission to Revise the Statutes, Penal Code Comments (1969).

It is clear that our forgery statute was intended to be quite comprehensive in the mischief it was meant to proscribe in the legitimate exercise of the legislative power. We have already decided that, under the circumstances of this case, preemption has not been proven, and, therefore, the conduct of the defendant concerning the federal forms 941 can properly be violations of the forgery statute. That Rheault was an employee of the IRS does not mean that she cannot be a "public servant" under our forgery statute; she was. We cannot accept the defendant's restrictive proffer of the meaning of "public office" only as a place where one is free to go and see the records one wishes.[32]

## V

The defendant's final claim is that the prosecutor's "repeated references to him as a 'con man' who has

---

[32] Parenthetically, we note that subdivision (2) of § 53a-139 (a) is directed to "a public record *or* an instrument . . . ." (Emphasis added.) There is no claim, nor can we see any, that the adjective "public" was intended to apply to "instrument" as well as "record." If there was, the legislature did not say so. The intent of the legislation is found not in what the legislature meant

'conned a lot of people'" so infected the trial with unfairness as to constitute a denial of due process that violated his fundamental right to a fair trial.[33] We do not agree.

Initially, we note that defense counsel did not object at trial to any of the comments made by the prosecutor. The defendant, therefore, now seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

"Under *Golding*, a defendant can prevail on an unpreserved claim of constitutional error only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of . . . constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Graham*, 33 Conn. App. 432, 441–42, 636 A.2d 852, cert. denied, 229 Conn. 906, 640 A.2d 117 (1994). "The first two questions relate to whether a defendant's claim is

to say, but in what it did say. See *State Medical Society* v. *Board of Examiners in Podiatry*, 208 Conn. 709, 727, 546 A.2d 830 (1988); *Colli* v. *Real Estate Commission*, 169 Conn. 445, 452, 364 A.2d 167 (1975).

[33] The prosecutor said during his opening argument: "Mr. Radzvilowicz is a very capable con man, he's articulate and he conned a lot of people, not Mr. Tavarozzi alone."

During his closing argument the prosecutor said: "I submit to you that this defendant is simply someone who cannot be believed. He has attempted to con people during the course of his employment with these various companies . . . . Ladies and gentlemen, the defendant has conned people over the last couple of years. I am confident that he will not con you also. Please demonstrate to Mr. Radzvilowicz that you know him for what he is."

Although the defendant refers to the Connecticut constitution in his brief, he does no more than that and we need not address it. See *State* v. *Wilkes*, 236 Conn. 176, 183 n.9, 671 A.2d 1296 (1996); *State* v. *Williams* 231 Conn. 235, 247 n.16, 645 A.2d 999 (1994); *Hayes* v. *Smith*, 194 Conn. 52, 66 n.12, 480 A.2d 425 (1984).

reviewable, and the last two relate to the substance of the actual review." (Internal quotation marks omitted.) *State* v. *Thurman*, 10 Conn App. 302, 306, 523 A.2d 891, cert. denied, 204 Conn. 805, 528 A.2d 1152 (1987); *State* v. *Newton*, 8 Conn. App. 528, 531, 513 A.2d 1261 (1986). The first two conditions of *Golding* are satisfied here. The record is adequate to review the alleged claim of error. The defendant's right to due process and a fair trial is of constitutional dimension. See *State* v. *Couture*, 194 Conn. 530, 562, 564–65, 482 A.2d 300 (1984), cert. denied 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985); *State* v. *Williams*, 204 Conn. 523, 539, 529 A.2d 653 (1987). We have said that " '[w]e are free . . . to dispose of the claim by focusing on the condition that appears most relevant under the circumstances of the case.' " *State* v. *Krzywicki*, 39 Conn. App. 832, 836, 668 A.2d 387 (1995), quoting *State* v. *Andrews*, 29 Conn. App. 533, 537, 616 A.2d 1148, cert. denied, 224 Conn. 924, 618 A.2d 531 (1993); see *State* v. *Pinnock*, 220 Conn. 765, 778, 601 A.2d 521 (1992), cert. denied, 224 Conn. 928, 619 A.2d 851 (1993); *State* v. *Golding*, supra, 213 Conn. 240; *State* v. *Dukes*, 29 Conn. App. 409, 418, 616 A.2d 800 (1992). In this case, we conclude that the defendant's claim does not satisfy the third condition of *Golding*.

In *State* v. *Couture*, supra, 194 Conn. 562, quoting *Smith* v. *Phillips*, 455 U.S. 209, 219, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982), our Supreme Court said: " '[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.' " See *State* v. *Cosgrove*, 186 Conn. 476, 488, 442 A.2d 1320 (1982); *State* v. *Oehman*, 212 Conn. 325, 336, 562 A.2d 493 (1989); *State* v. *Ubaldi*, 190 Conn. 559, 562, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983). "[T]he aim of due process is not punishment of society for the misdeeds of the prosecu-

tor but avoidance of an unfair trial to the accused." (Internal quotation marks omitted.) *Smith* v. *Phillips*, supra, 219; *State* v. *Cosgrove*, supra, 489.

It is correct that the prosecutor did, in argument, submit to the jury that the "defendant [was] simply someone who cannot be believed." While this was not appropriate; *State* v. *Williams*, supra, 204 Conn. 541; it did not, singly or in the context of the entire trial, afford support to the defendant's claim. The prosecutor's remarks about the defendant being a "con man" and that he had indulged in such activities, although inappropriate, do not in context, together with all the challenged remarks, avail the defendant. Our conclusion here is supported by our careful examination of the entire trial transcript. The challenged remarks were fairly isolated, were "unrepresentative of a pattern of conduct repeated throughout the trial"; (internal quotation marks omitted) *State* v. *Hammond*, 221 Conn. 264, 290, 604 A.2d 793 (1992); *State* v. *Tweedy*, 219 Conn. 489, 509, 594 A.2d 906 (1991); and, to the extent that they were inappropriate, were not, in context, "blatantly egregious" to merit the relief as asked. *State* v. *Watlington*, 216 Conn. 188, 193, 579 A.2d 490 (1990); *State* v. *McFadden*, 25 Conn. App. 171, 177, 593 A.2d 979, cert. denied, 220 Conn. 906, 593 A.2d 972 (1991).[34]

It can fairly be said that the state had a strong case against the defendant. See *State* v. *Lucci*, supra, 25 Conn. App. 348. In sum, the challenged remarks "did not deprive the defendant of a fair trial; see *State* v. *Golding*, supra, 213 Conn. 239–40; or otherwise implicate the fairness and integrity of and public confidence in the judicial proceedings. See *State* v. *Day*, 233 Conn.

[34] During the trial, the jury heard the defendant admit that he had twice been convicted of a felony. One conviction was in 1985 for which he was sentenced to eight years to be suspended after one year with three years probation. The second conviction was in 1988 for ten years to be suspended after five years with five years probation.

813, 849, 661 A.2d 539 (1995)." *State* v. *Chance,* supra, 236 Conn. 64. This claim, therefore, does not warrant *Golding* review as the defendant has not demonstrated that alleged constitutional violation exists and clearly deprived him of a fair trial.

The judgments are affirmed.

In this opinion the other judges concurred.