THE TIMES MIRROR COMPANY ET AL. *v.* DIVISION OF
PUBLIC UTILITY CONTROL ET AL.
(12039)
(12045)

PETERS, HEALEY, PARSKEY, GRILLO and SPADA, Js.

Argued January 4—decision released March 27, 1984

*Elliot F. Gerson,* deputy attorney general, with whom
were *William B. Gundling,* assistant attorney general,

and, on the brief, *Joseph I. Lieberman,* attorney general, and *Robert S. Golden, Jr.,* assistant attorney general, for the appellant (named defendant).

*Barry S. Zitser,* consumer counsel, for the appellant (defendant division of consumer counsel).

*George H. Shapiro,* of the District of Columbia bar, with whom where *James J. Kennelly, Howard L. Slater* and, on the brief, *Barry S. Feigenbaum,* for the appellees (plaintiffs).

*Milton Sorokin, Ethel S. Sorokin,* and *Richard C. Robinson* filed a brief as amici curiae.

PETERS, J. The sole issue in this appeal is whether the Federal Communications Commission has preempted state regulation of cross-ownership of cable television stations and newspapers. The present proceeding was initiated by a motion filed by the Division of Consumer Counsel (DCC) asking the Department of Public Utility Control (DPUC) to investigate the suitability of control by the Times Mirror Company (Times Mirror) of two Connecticut community antenna television (CATV) systems. The motion was based upon Times Mirror's anticipated purchase of a local newspaper, the Hartford Courant (Courant). The DPUC, after full hearings, determined on March 7, 1980, that the cross-ownership of cable television stations and a newspaper in the same geographic area was not in the public interest and ordered revocation of the two CATV franchises unless Times Mirror divested itself of its ownership of the Courant by April 1, 1981. This order was stayed pending judicial review. The plaintiffs, Times Mirror and its subsidiaries,[1] successfully appealed to the trial court

---

[1] The plaintiffs are the Times Mirror Company, Communications Properties, Inc., Telesystems of Connecticut, Inc., and Hartford CATV, Inc. Although the name of Communications Properties, Inc., has been changed to Times Mirror Cable Television, Inc., the parties have continued to refer to this company as CPI, and we shall follow that convention. The two CATV systems are generally referred to as TOC and HCTV.

from the decision of the DPUC. That court concluded that the DPUC order was invalid because of preemption by the federal regulatory scheme of the Federal Communications Commission (FCC). Upon the granting of certification by this court, the defendants DPUC and DCC each took a further appeal here.[2] We find error and remand for further proceedings.[3]

There is no dispute about the facts that pertain to this appeal. Since early in 1979, Times Mirror has owned all of the stock of Communications Properties, Inc. (CPI). CPI, in turn, owns 90 percent of the voting stock of Hartford CATV, Inc. (HCTV) and, through a wholly owned subsidiary, 95 percent of the voting stock of Telesystems of Connecticut, Inc. (TOC). In accordance with General Statutes § 16-331,[4] the DPUC had

[2] Although there are technically two appeals, we shall treat them as one, since the same issue is presented in each.

[3] In the appeal to the trial court, the plaintiffs raised numerous issues other than preemption which the trial court did not reach.

[4] "[General Statutes] Sec. 16-331. CERTIFICATE OF PUBLIC CONVENIENCE AND NECESSITY. MEETINGS WITH ADVISORY COUNCIL. (a) No person, association or corporation shall construct or operate a community antenna television system without having first obtained a certificate from the department of public utility control certifying that public convenience and necessity require the operation of such a service within the territory specified in such certificate. Notwithstanding the provisions of section 33-286, the certificate shall authorize the holder thereof to occupy public highways to the extent required to provide community antenna television system service. The certificate shall be issued only after written application for the same has been made to the department, accompanied by a fee of fifty dollars, and public hearing has been held thereon. No certificate shall be sold or transferred without the approval of the department. For due cause shown, the department may amend, suspend or revoke any such certificate. If a certificate is not exercised within two years from the date of issue, the department may revoke the certificate. The department may specify in the certificate at the time of issue and from time to time thereafter such terms and conditions as the public interest may require. The department may amend a certificate to include in the franchise municipalities which are not included in any other franchise, if the department finds, after a hearing, that such an amendment is in the public interest and not unduly detrimental to the holder of the certificate.

"(b) In determining whether a new certificate shall be granted or exist-

previously granted HCTV and TOC separate franchises to provide cable television, the former for the towns of Hartford, West Hartford, East Hartford, Windsor, Bloomfield and Simsbury, and the latter for the towns of Meriden, Southington and Cheshire. When the DPUC approved acquisition of CPI by Times Mirror in 1978,[5] the DPUC expressly noted that Times Mirror did not, at that time, own or control any newspaper, radio or television stations in the franchise areas of HCTV or TOC. The DPUC specifically ordered Times Mirror thereafter to inform the commission "of any and all contemplated acquisitions of Connecticut media."

ing certificate transferred, the department of public utility control shall take into consideration the public need for the proposed service, the suitability of the applicant or, if the applicant is a corporation, of its management, the financial responsibility of the applicant and the ability of the applicant to perform efficiently the service for which authority is requested. In the case of an application filed on or after October 1, 1981, (1) if the applicant or an affiliate thereof is the holder of one or more other certificates in the state, the department shall also consider the possible adverse effects of increasing the concentration of ownership of community antenna television systems and related services, which would result from granting the application and (2) suitability of the applicant shall include consideration of participating owners resident in the proposed service area as well as involvement in local civic and community activities. In considering concentration of ownership the department shall take into account the following factors: (A) Federal and state anti-trust and unfair trade practices laws, regulations and policies; (B) concentration of media and editorial functions; and (C) the reduced ability of the department to make comparisons with other certificate holders.

"(c) An officer of a community antenna television company granted a certificate of public convenience and necessity in accordance with this section shall, twice a year, arrange for and hold a meeting with the advisory council established by regulation for the franchise area served by such company. The department shall designate an advisory council as an intervenor in any contested case before the department involving the community antenna television company which the council is advising. Such company shall provide to the chairperson of its advisory council a copy of any report, notice or other document it files with the department."

[5] DPUC approval of Times Mirror's acquisition of CPI was required because the DPUC views the transfer of 30 percent of the stock of a CATV system as a transfer of control of the system. See General Statutes § 16-43.

On July 12, 1979, Times Mirror notified the DPUC of its anticipated purchase of the Hartford Courant, a newspaper with extensive circulation throughout the state of Connecticut, including significant circulation in the same market areas served by the two cable franchises. Subsequent to notification of the DPUC, Times Mirror completed its acquisition of the Courant.

Connecticut has regulated cable television systems, formally known as community antenna television systems, since the enactment in 1963 of General Statutes § 16-330 et seq. The legislature has empowered the DPUC and predecessor commissions[6] to grant CATV franchises upon a finding of public convenience and necessity, and has declared a CATV system to be a public service company. *Connecticut Television, Inc.* v. *Public Utilities Commission,* 159 Conn. 317, 330, 269 A.2d 276 (1970). For present purposes, we may assume that the DPUC has plenary authority to consider the suitability of cross-ownership by Times Mirror of HCTV and TOC on the one hand, and the Courant on the other, unless this state's regulation of cross-ownership is preempted by federal action taken by the FCC.

The question of preemption is one of federal law, arising under the supremacy clause of the United States constitution. U.S. Const., art. VI.[7] As the United States Supreme Court has recently reiterated, "state law can be preempted in either of two general ways. If Con-

---

[6] The agency charged with supervision of cable television was known, until 1975, as the Public Utilities Commission. From 1975 to 1979, regulation was in the hands of the Public Utilities Control Authority. Public Acts 1975, No. 75-486, § 1. Since 1979, the regulatory agency has been the Division of Public Utility Control within the Department of Business Regulation. Public Acts 1977, No. 77-614, § 162.

[7] Article VI of the constitution of the United States provides in part: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

gress evidences an intent to occupy a given field, any state law falling within that field is preempted. [*Pacific Gas & Electric Co.* v. *State Energy Resources Conservation & Development Commission,* 461 U.S. 190, 203, 103 S. Ct. 1713, 75 L. Ed. 2d 752 (1983)]; *Fidelity Federal Savings & Loan Ass'n* v. *de la Cuesta,* 458 U.S. 141, 153 [102 S. Ct. 3014, 73 L. Ed. 2d 664] (1982); *Rice* v. *Santa Fe Elevator Corp.,* 331 U.S. 218, 230 [67 S. Ct. 1146, 91 L. Ed. 1447] (1947). If Congress has not entirely displaced state regulation over the matter in question, state law is still preempted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, *Florida Lime & Avocado Growers, Inc.* v. *Paul,* 373 U.S. 132, 142–43 [83 S. Ct. 1210, 10 L. Ed. 2d 248, reh. denied, 374 U.S. 858, 83 S. Ct. 1861, 10 L. Ed. 2d 1082] (1963), or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress. *Hines* v. *Davidowitz,* 312 U.S. 52, 67 [61 S. Ct. 399, 85 L. Ed. 581] (1941)." *Silkwood* v. *Kerr-McGee Corporation,* 464 U.S. 238, 248, 104 S. Ct. 615, 78 L. Ed. 2d 443 (1984). Regulations promulgated by federal adminstrative agencies, if within the agency's authorized scope of discretion, have the same preemptive effect as acts of Congress. *Fidelity Federal Savings & Loan Assn.* v. *de la Cuesta,* 458 U.S. 141, 153, 102 S. Ct. 3014, 73 L. Ed. 2d 664 (1982).

In the determination of whether state law has been preempted, the Supreme Court of the United States has in recent years retreated from its earlier view that there was no room for any state regulation of matters already regulated by the federal government. See Tribe, American Constitutional Law, pp. 377–79. State law is today preempted " 'only to the extent necessary to protect the achievement of the aims of' the federal law." *De Canas* v. *Bica,* 424 U.S. 351, 357–58 n. 5, 96 S. Ct. 933, 47 L. Ed. 2d 43 (1976); *Merrill Lynch,*

*Pierce, Fenner & Smith* v. *Ware,* 414 U.S. 117, 127, 94 S. Ct. 383, 38 L. Ed. 2d 348 (1973). The governing federal principle now is that "federal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained." *Florida Lime & Avocado Growers, Inc.* v. *Paul,* supra, 142. "[C]ourts should not readily infer that Congress has deprived states of the power to act on interests 'deeply rooted in local feeling and responsibility' which only peripherally concern an area controlled by nonconflicting federal legislation. *San Diego Building Trades Council* v. *Garmon,* 359 U.S. 236, 243–44, 79 S. Ct. 773, 3 L. Ed. 2d 775 (1959)." *Shea* v. *First Federal Savings & Loan Assn. of New Haven,* 184 Conn. 285, 294, 439 A.2d 997 (1981); see also *Connecticut Television, Inc.* v. *Public Utilities Commission,* 159 Conn. 317, 338–39, 269 A.2d 276 (1970).

In order to determine whether Connecticut regulation of cable television cross-ownership has been preempted by the action of the FCC, we must decide, in accordance with these principles, whether Congress has evidenced an intent to occupy the field, or whether state regulation conflicts with federal regulation. It is useful to examine these two prongs of preemption law separately.

The question of the extent to which cable television is exclusively in the federal regulatory domain has not often been addressed. The Supreme Court of the United States has held that the Communications Act of 1934, 47 U.S.C. § 151 et seq., confers upon the FCC "a circumscribed range of power to regulate cable television"; *FCC* v. *Midwest Video Corporation,* 440 U.S. 689, 696, 99 S. Ct. 1435, 59 L. Ed. 2d 692 (1979). The FCC itself, in its principal over-all review of cable tel-

evision, has acknowledged that its jurisdiction is concurrent with that of state and local governments and has sought to implement what it has characterized as "a deliberately structured dualism." *Cable Television Report and Order,* 36 F.C.C.2d 143, 207 (1972). Because regulation of cable television is not an area of the law inherently requiring national uniformity, in the absence of express congressional preemption, we held in 1970, relying on *TV Pix, Inc.* v. *Taylor,* 304 F. Sup. 459, 464–65 (D. Nev. 1968), aff'd without opinion, 396 U.S. 556, 90 S. Ct. 749, 24 L. Ed. 2d 746 (1970), that the FCC had not acted to assert exclusive jurisdiction over cable television. *Connecticut Television, Inc.* v. *Public Utilities Commission,* supra, 340.

The plaintiffs urge us nonetheless to find a federal intent to occupy the field, because they argue that the relevant field is not cable television as a whole but rather media cross-ownership. Identification of the appropriate field is a question of some difficulty.[8] In *Pacific Gas & Electric Co.* v. *State Energy Resources Conservation & Development Commission,* 461 U.S. 190, 212, 103 S. Ct. 1713, 75 L. Ed. 2d 752 (1983), the court noted that Congress had preserved dual federal-state regulation of nuclear-powered electricity, but had completely occupied the field of nuclear safety concerns. The court held that "[w]hen the federal government completely occupies a given field or an identifiable portion of it . . . the test of preemption is whether 'the matter on which the state asserts the right to act is in any way regulated by the federal government.' " Id., quoting *Rice* v. *Santa Fe Elevator Corporation,* supra, 236.

---

[8] Definition of the field for preemption purposes raises some of the same difficulties that inhere in definition of the market for antitrust purposes. "[M]arket definition issues have dominated the treatment of monopoly power in the leading [Sherman Act] § 2 monopoly cases." II Areeda & Turner, Antitrust Law (1978) ¶ 533, p. 406 and also ¶ 528, pp. 385–88.

We must therefore determine whether media cross-ownership involving cable television is a field "or an identifiable portion of it" which expressly or inferentially has been reserved for federal regulation. This is an issue which the trial court did not directly address, having found preemption under the second prong of preemption law.

It is undisputed that the FCC has regulated media cross-ownership in a number of specific circumstances. The FCC has, in areas other than cable television, imposed limitations on cross-ownership of broadcast stations, of broadcast stations and television stations, and of broadcast stations, television stations and newspapers, but left unregulated cross-ownership of television stations and weekly newspapers. 47 C.F.R. §§ 73.35, 73.240 (a), 73.636 (a) (2) (1982). For cable, the FCC has prohibited cross-ownership of cable systems and television stations, cable systems and television networks, and cable systems and telephone companies. 47 C.F.R. §§ 63.54, 63.57, 76.501 (1982).

The FCC has furthermore considered whether to regulate cable-newspaper cross-ownership but determined, in 1975, "to issue no rules at this time prohibiting or restricting such cross-interests." *First Report (Docket No. 18891),* 52 F.C.C.2d 170, 171 (1975). In that report, the FCC stated that it proposed to postpone a final determination "until such time as we find abusive trends developing or have more conclusive information as to the potential harms that may be involved . . . ." Id. The report concluded by retaining jurisdiction "for such future consideration as developments in the industry or our own analysis suggest is necessary." Id., 172.

The FCC's decision to leave cable-newspaper cross-ownership unregulated for the time being does not necessarily signal an intent to open the field of cross-media ownership to state regulation. In 1971, when the

FCC first attempted to draw a line demarcating federal from state control over cable television, it stated that "federal regulation is clearly indicated in such areas as signals carried, technical standards, program origination, cross-ownership of cable and other media, and equal employment opportunities." *Commission Proposals for Regulation of Cable Television,* 31 F.C.C.2d 115, 136 (1971). By 1975, however, the FCC had retreated from the categorical assumption of jurisdiction over media cross-ownership. In a report intended to delineate those aspects of cable regulation that came within the province of the commission and those that were the responsibility of nonfederal officials, the FCC sought to distinguish "between reasonable regulations regarding use of the streets and rights-of-way and the regulation of the operational aspects of cable communications. The former is clearly within the jurisdiction of the states and their political subdivisions. The latter, *to the degree exercised,* is within the jurisdiction of this Commission." (Emphasis added.) *Report and Order (Docket No. 20272),* 54 F.C.C.2d 855, 861 (1975). This report, which postdated the decision to leave cable-newspaper cross-ownership unregulated, expressly disavowed "the broad-brush approach considered prior to our 1972 rules of total preemption and federal licensing." Id., 863. Instead, it opted for subject matter preemption. The list of preempted subject areas included "signal carriage, pay cable, leased channel regulations, technical standards, access, and several aspects of franchise responsibility"; id., 863; but not media cross-ownership. The conclusion that this report counsels against inferential preemption of cross-media ownership is confirmed by the express statement in a subsequent FCC case that "[i]t is not our intention to preempt the rights of the states to adopt cross-ownership prohibitions as they see fit." *Report and Order (CC Docket No. 80–767),* 88 F.C.C. 2d 564, 577 (1981), reconsid. denied, 91 F.C.C.2d 622 (1982).

This history, combined with unresolved doubts about the FCC's jurisdiction over cable-newspaper cross-ownership,[9] is far from persuasive that federal regulation, either of cable television in general or of media cross-ownership in particular, has pervasively filled the field. We agree, therefore, with the defendants that the action of the DPUC in this case has not been preempted by federal occupation of the field.

Even if Congress has not given persuasive evidence of its intent to occupy the field of cable television media cross-ownership, Connecticut may still be barred, under the second prong of preemption law, from taking action that actually conflicts with federal regulation. The question then becomes, as a first subset, whether it is impossible to comply with both state and federal law, or, as a second subset, whether state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress. *Silkwood* v. *Kerr-McGee Corporation,* 464 U.S. 238, 104 S. Ct. 615, 78 L. Ed. 2d 443 (1984); *Pacific Gas & Electric Co.* v. *State Energy Resources Conservation & Development Commission,* 461 U.S. 190, 204, 103 S. Ct. 1713, 75 L. Ed. 2d 752 (1983). As the holdings of no preemption in these cases illustrate, we should not reach to find actual conflict if accommodation of both federal and state interests is possible.

The plaintiffs do not contend that compliance with the DPUC's rules on cable and newspaper cross-ownership would require them to violate outstanding FCC regulations. It is clearly possible for them to comply with both federal and state law.

---

[9] The DPUC has raised an issue, both in the trial court and in this court, concerning the authority of the FCC to regulate cable-newspaper cross-ownership when it lacks direct congressional authority over either of these two media. In light of our holding on preemption, we need not decide this issue.

The plaintiffs do contend that the action taken by the DPUC stands as an obstacle to the accomplishment of the full purposes and objectives of the FCC. They claim, and the trial court held, that the decision by the FCC in 1975 to postpone a final determination about regulation of cable-newspaper cross-ownership, while retaining jurisdiction "for . . . future consideration"; *First Report (Docket No. 18891),* 52 F.C.C.2d 170, 172 (1975); is a determination that there shall be no such regulation by anyone. There is no doubt that when federal law manifests a federal judgment that the absence of regulation will best serve federal objectives, state regulation is preempted. *Mobil Oil Corporation v. Dubno,* 492 F. Sup. 1004, 1010–11 (D. Conn. 1980), appeal dismissed in part and aff'd in part, 639 F.2d 919 (2d Cir. 1981). While we agree with the principle upon which the trial court relied, we disagree with its applicability to the record of FCC regulation in this case.

As we noted in our discussion of preemption by occupation of the field, the FCC has retreated from its earlier intention to keep within the federal regulatory domain all issues relating to media cross-ownership. Id., 1010–11. If we examine the FCC decision to postpone a final determination about regulation of cable-newspaper cross-ownership in this light, we must conclude that a federal policy of watchful waiting is not inconsistent with state experimentation with limited cross-media regulation. As we held in *Connecticut Television, Inc.* v. *Public Utilities Commission,* 159 Conn. 317, 339–40, 269 A.2d 276 (1970), FCC identification of a need for continued federal inquiry into media cross-ownership is not sufficient to establish federal preemption.

The plaintiffs argue that *Connecticut Television, Inc.* v. *Public Utilities Commission* is distinguishable from this case. They acknowledge that selection of a cable franchisee is indeed a matter primarily within the con-

trol of local officials.[10] They concede that, in the franchisee selection process, media cross-ownership may appropriately be considered as one of several comparative factors in choosing among competing franchise applicants. This was the factual background of *Connecticut Television. Connecticut Television, Inc.* v. *Public Utilities Commission,* supra, 333. The plaintiffs assert, however, that there is a significant distinction between factors used to make a comparative choice, which fall within local control, and rules which establish an applicant's eligibility, over which the FCC, in their view, exercises exclusive jurisdiction. We find this argument unpersuasive. We fail to see how there can be a logical distinction, for preemption purposes, between partial and total local prohibition of media cross-ownership. Furthermore, the record does not establish that the DPUC has adopted an outright ban on cable-newspaper cross-ownership, since it permitted the plaintiff Times Mirror to acquire control over the plaintiff CATV systems despite Times Mirror's ownership of two newspapers located in Stamford and Greenwich.

We note finally that the FCC has not relied on implied preemption when it has intended to foreclose state and local regulatory activity. When the FCC determined that it would regulate the rates and the program content of special pay cable programming, it stated expressly that it had concluded that, "at this time, there should be no regulation of rates for such services at all by any governmental level." *Clarification of the Cable Television Rules and Notice of Proposed Rulemak-*

---

[10] With regard to franchise standards, the FCC has expressly regulated permissible franchise fees; see 47 C.F.R. § 76.31; but has otherwise left to the local franchising process the promulgation of provisions about such matters as qualifications of a franchisee, the duration of a franchise, the speedy availability of franchise service and the accountability of franchisees for proper service. Recommendations by the FCC for regulation of these questions have been expressly designated as not mandatory. See note following 47 C.F.R. § 76.31 (1982).

*ing and Inquiry (Docket Nos. 20018 et al.),* 46 F.C.C.2d 175, 199 (1974). A year later, the FCC reiterated that it regarded its prior statements concerning the regulation of subscription operations "as preempting local regulation of rates as well as program content." *First Report and Order (Docket No. 19554),* 52 F.C.C.2d 1, 67 (1974). Similarly, when dealing with cable television subscriber rates, the FCC declared that it had "taken the position that rates for subscription television programs, leased channels, advertising, and other auxiliary services should not be regulated at either the local, state, or federal levels at this time. . . . [T]he Commission has not only declined to regulate the rates for these services but has preempted their regulation by state and local authorities." *Notice of Inquiry (Docket No. 20767),* 58 F.C.C.2d 915, 915–16 (1976). In the apt language of the United States Court of Appeals for the Second Circuit, "[t]he policy to preempt has been shouted from the rooftops . . . ." *Brookhaven Cable TV, Inc.* v. *Kelly,* 573 F.2d 765, 768 (2d Cir. 1978), cert. denied, 441 U.S. 904, 99 S. Ct. 1991, 60 L. Ed. 2d 372 (1979).

We therefore conclude that there is no persuasive evidence that the FCC intended, by its own deferment of regulation of cable-newspaper cross-ownership, to preclude local consideration of such cross-ownership in the award or in the revocation of a cable franchise. In the absence of such an intent to preempt, the action by the DPUC in this case is not an obstacle to the accomplishment of the full purposes and objectives of Congress.

Our determination that the DPUC's order was not barred by the federal law of preemption does not dispose of the plaintiffs' appeal from that order. Since there were other grounds of appeal that the trial court did not reach, those issues must now be litigated.

There is error, the judgment is set aside, and the case is remanded for further proceedings in accordance with this opinion.

In this opinion the other judges concurred.