[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON DEFENDANTS' MOTIONS TO DISMISS
The plaintiffs, Mayor Joseph P. Ganim and the City of Bridgeport, have brought this action against a number of firearms manufacturers, trade associations and retail sellers.[1] The complaint alleges that the defendants have the ability to make guns safer by incorporating locks and other safety features that would prevent children from shooting guns and killing themselves or others, but they have chosen not to do so. (First Amended Complaint, Preface, ¶¶ 1, 2 and 57-64.) According to the amended complaint, the defendants are aware that a substantial portion of their products flow into a large illegal market supplying weapons to criminals, but they have chosen not to take reasonable steps to control distribution of their products so as to keep them out of criminals' hands. (First Amended Complaint, Preface, ¶¶ 5, 71-75.) While knowing that guns actually increase risk to everyone in a home where they are kept, the defendants allegedly have failed to warn about such danger and CT Page 15909 have misled the public into believing that buying a gun will make them safe by protecting their families from crime. (First Amended Complaint, Preface, ¶¶ 3, 4 and 65-70.) The defendants are alleged to have conspired amongst themselves to stop anyone in the gun industry from implementing safer designs or distribution control measures that would prevent their products from continuing to enter into a large illegal market. (First Amended Complaint, Preface, ¶¶ 157-59.) The defendants also are alleged to have caused a nuisance that seriously threatens public health, safety, and welfare in Bridgeport and continues to increase levels of crime as well as deaths and cause serious injuries. (First Amended Complaint, Preface, ¶¶ 7 and 83.)
The complaint is asserted in nine counts: violation of the Connecticut Products Liability Act (PLA), General Statutes §52-572 (first count); violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., for alleged deceptive advertising and unfair and deceptive sales practices (second and third counts); public nuisance (fourth count); negligence (fifth count); negligence specifically relating to production, marketing and distribution of handguns (sixth count); civil conspiracy (seventh and eighth counts) and unjust enrichment (ninth count)
In addition to compensatory and punitive damages for all of the harm suffered by Bridgeport as a result of the defendants' alleged conduct, the plaintiffs demand substantial injunctive relief. They seek to enjoin the defendants from continuing to produce handguns without safety devices, continuing to engage in deceptive advertising, and continuing to use deceptive sales practices. The plaintiffs also seek an immediate and permanent injunction requiring the defendants to take affirmative steps to reduce these alleged activities causing harm to Bridgeport. specifically, the plaintiffs demand warnings on all handguns, the creation of standards to eliminate the illegal secondary handgun market, and funding for programs designed to increase public awareness of the proper way to safely store and use handguns.
Pursuant to Practice Book §§ 10-30, 10-31 (a)(1) and 10-33, the defendants have moved jointly and severally to dismiss the first amended complaint. The essence of the motions to dismiss is the assertion that the plaintiffs lack standing to pursue their claims. The defendants argue that the plaintiffs' lack of standing deprives the court of subject matter jurisdiction, thereby requiring dismissal of the first amended complaint. CT Page 15910
The court finds as a matter of law that the plaintiffs lack standing to litigate these claims; thus, the court is without jurisdiction to hear this case. The plaintiffs have no statutory or common law basis to recoup their expenditures. They lack any statutory authorization to initiate such claims. They have no sovereign or parens patriae status to bring these claims on behalf of the citizens of Bridgeport. They seek to regulate firearms in a manner that is preempted by state law. They have failed to initiate their nuisance claim in accordance with the City of Bridgeport, Connecticut City Charter. For reasons explained below, the plaintiffs have failed to present a claim that is cognizable by law.
The Connecticut Supreme Court has held that a motion to dismiss "properly attacks the jurisdiction of the court, essentially asserting that the plaintiff cannot as a matter of law and fact state a cause of action that should be heard by the court. . . ." (Citation omitted.) Gurliacci v. Mayer,218 Conn. 531, 544, 590 A.2d 914 (1991). "[O]nce the question of lack of jurisdiction . . . is raised, [it] must be disposed of no matter in what form it is presented . . . and the court must fully resolve it before proceeding further with the case. (Citations omitted; internal quotation marks omitted.) CommunityCollaborative of Bridgeport, Inc. v. Ganim, 241 Conn. 546, 552,698 A.2d 245 (1997).
"It is a basic principle of law that a plaintiff must have standing for the court to have jurisdiction. Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he has . . . some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy. . . . (Citations omitted; internal quotation marks omitted.) Community Collaborative of Bridgeport v. Ganim, supra, 241 Conn. 552-53. "Standing focuses on the party seeking to be heard and not on the issues the party wants to have heard. . . . The question of standing does not involve an inquiry into the merits of the case." (Citations omitted; internal quotation marks omitted.) Lowe v. Lowe, 47 Conn. App. 354, 364, 704 A.2d 236
(1997). Moreover, "[a] case that is nonjusticiable must be dismissed for lack of subject matter jurisdiction. Kleinman v.Marshall, 192 Conn. App. 479, 484, 472 A.2d 772 (1984)." Mayer v.Biafore, Florek O'Neill, 245 Conn. 88, 91, 713 A.2d 1267
(1998). CT Page 15911
The supreme court very recently has reaffirmed the jurisdictional nature of the standing requirement. In ConnecticutAssociated Builders and Contractors v. Hartford, 251 Conn. 169,178, ___ A.2d ___ (1999), the court held that "the present litigation raises no new issues of principle with respect to the requirements of standing, either in general or in the particular context of competitive bidding.[2] To establish standing to raise an issue for adjudication, a complainant must make a colorable claim of direct injury. . . . Standing is . . . a practical concept designed to insure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented. . . . These two objectives are ordinarily held to have been met when a complainant makes a colorable claim of direct injury [that the complainant] has suffered or is likely to suffer, in an individual or representative capacity. Such a personal stake in the outcome of the controversy . . . provides the requisite assurance of concrete adverseness and diligent advocacy." (Citations omitted; internal quotations marks omitted.) Id., 78.
"To fulfill these goals, the standing doctrine requires a plaintiff to demonstrate two facts. First, the complaining party must be a proper party to request adjudication of the issues. . . . Second, the person or persons who prosecute the claim on behalf of the complaining party must have authority to represent the party. . . . A complaining party ordinarily can show that it is a proper party when it makes a colorable claim of [a] direct injury [it] has suffered or is likely to suffer, in an individual or representative capacity. Such a personal stake in the outcome of the controversy . . . provides the requisite assurance of concrete adverseness and diligent advocacy. . . . To demonstrate authority to sue, however', it is not enough for a party merely to show a colorable claim to such authority. Rather, the party whose authority is challenged has the burden of convincing the court that the authority exists. . . ." (Citations omitted; internal quotation marks omitted.) CommunityCollaborative of Bridgeport v. Ganim, supra, 241 Conn. 553-54; see also, Crone v. Gill, 250 Conn. 476, 479, ___ A.2d ___ (1999) (attorney lacks standing to challenge disqualification order on appeal because he has no right cognizable by law to represent a particular client.) CT Page 15912
Accordingly, the essential issue before this court is whether the plaintiffs can maintain that their claimed interest has been specially and injuriously affected in a way that is cognizable by law. The general rules of standing will determine the plaintiffs' ability to maintain their non-statutory claims alleged in the fourth[3] through ninth counts. Conversely, in order to maintain the statutory claims asserted in the first through third counts, the plaintiffs must meet the statutory definition of persons intended to bring these actions.
The plaintiffs' allegations of harm as outlined above from the preface of the first amended complaint characterize their damages as including expenditures of large amounts of money on police, prisons, medical care, fire department services, emergency services, public health services, social services, pension benefits, court resources and other services and facilities. The complaint also alleges substantial losses of tax revenue, investment, economic development and productivity as a result of the defendants' actions.
The defendants contend that the plaintiffs' claims are too remote to be cognizable by law. Indeed, it is recognized at common law that a plaintiff who complains of harm resulting from misfortune visited upon a third person is generally held to stand at too remote a distance to recover. Holmes v. SecuritiesInvestor Protection Corp. , 503 U.S. 258, 268-69, 112 S.Ct. 1311,117 L.Ed.2d 532 (1992); Laborers Local 17 Health Benefit Fundv. Phillip Morris, Inc., ___ F.3d ___ (2d Cir. August 18, 1999). An early Connecticut case was instrumental in the recognition of this principle. In Connecticut Mutual Life Insurance Co. v. NewYork New Haven R. Co., 25 Conn. 265, 276 (1856), the supreme court held that an insurance company could not recover from a third party for the death of its insured. More than a century later, the court held in Maloney v. Pac, 183 Conn. 313, 321,439 A.2d 349 (1981), that standing requires a colorable claim of direct injury to the complaining party. Connecticut courts also follow the usual rule against vicarious third party liability.Stamford Hospital v. Vega, 236 Conn. 821, 659, 674 A.2d 821
(1996); Third Taxing District v. Lyons, 35 Conn. App. 795, 798,647 A.2d 32, cert. denied, 231 Conn. 936, 650 A.2d 173 (1994).
According to the plaintiffs, they have suffered direct injury in the form of expenditures they have had to make for increased police and fire protection, as well as medical and other public services necessitated by gun injuries to persons who are not CT Page 15913 parties to this litigation.[4] The court notes that the complained of misuse of firearms necessitating increased police protection and other social services are in fact acts of unidentified persons who are not named or represented as parties in this lawsuit.
In advance of their unusual theories supporting this litigation, the plaintiffs draw inspiration if not precedent from the "tobacco" cases. These are a series of suits brought by states claiming damages against tobacco companies for the cost of medical care expended by the states on behalf of sick smokers. Generally, a state's right to maintain such an action has been held cognizable by law. See State Ex. Rel. Norton v. R.J.Reynolds Tobacco Co., Docket No. 3432 (Cob. Dist. Ct., October 2, 1998); State Ex. Rel. Kelley v. Phillip Morris, Inc., Docket No. 84281 (Mich. Cir. Ct., May 28, 1997); State Ex. Rel. Humphrey v.Phillip Morris, Inc., Docket No. 8565 (Minn. Dist. Ct., Feb. 19, 1998); State v. Phillip Morris, Inc., Docket No. 744 (Vt.Sup.Ct., Mar. 25, 1998); State v. American Tobacco Co., Docket No. 15056 (Wash.Sup.Ct., Nov. 19, 1996); State Ex. Rel. Bronster v.Brown Williamson Tobacco Corp. , Docket No. 441 (Hawaii Cir. Ct., Sept. 18, 1998). In each of these cases, state statutes authorized the state to maintain its claims against the defendant tobacco companies.[5] In Texas v. American Tobacco Co., 14 F. Sup.2d 956,962-63 (E.D. Tex. 1997), the unique quasi-sovereign right of the state to protect the health and welfare of its citizens afforded it standing to sue.[6] The result of these cases is that states that sued tobacco companies have been promised more than $200 billion over a twenty-five year period.
When conceiving the complaint in this case, the plaintiffs must have envisioned such settlements as the dawning of a new age of litigation during which the gun industry, liquor industry and purveyors of "junk" food would follow the tobacco industry in reimbursing government expenditures and submitting to judicial regulation.
The tobacco litigation, by the states, has not succeeded in eradicating the rules of law on proximate cause, remoteness of damages and limits on justiciability. This is evidenced by a series of federal appellate decisions dismissing "me-too" cases initiated by insurers and health and welfare funds against the tobacco companies. See International Brotherhood of Teamsters,Local 734 Health and Welfare Trust Fund v. Philip Morris Inc., ___ F.3d ___ (7th Cir., November 15, 1999); Laborers Local 17 Health CT Page 15914Benefit Fund v. Philip Morris, Inc., supra, ___ F.3d ___ (2d Cir., August 18, 1999); Steamfitters Local Union No. 420 Welfare Fundv. Philip Morris, Inc., 171 F.3d 912 (3d Cir. 1999); and OregonLaborers-Employers Health Welfare Trust Fund v. Philip Morris,Inc., 185 F.3d 957 (9th Cir. 1999). Just as the states had sought reimbursement for the expense of medical care on behalf of citizens affected by cigarette smoking, these cases involve claims by insurers and health and welfare funds for medical expenses paid on behalf of smokers. In all of these cases the insurer or fund claims were dismissed because, unlike the claims brought by the states, insurers and private welfare funds are not statutorily authorized to initiate direct actions against a third party tortfeasor; nor do they enjoy a statutory right of subrogation, or possess the unique quasi-sovereign rights of the state. The Second Circuit noted in Laborers Local 17 v. PhilipMorris, Inc., supra, ___ F.3d ___, that: "Hence, in general, state cases are often distinguishable on the issue of proximate causation given the state's unique role relative to protection of its citizens, statutes governing medicaid recoupment, and certain state statutes that permit states to maintain actions on behalf of their citizenry." Id.
The plaintiffs can cite no statute specifically authorizing them to recoup the expenditures they claim or obtain the injunctive relief they seek. Plaintiffs cite a provision of Connecticut's Home Rule Act, General Statutes § 7-148 (c)(1), which essentially provides that "[a]ny municipality shall have the power to . . . (A) . . . sue and be sued, and institute, prosecute, maintain and defend any action or proceeding in any court of competent jurisdiction." Also relied upon by the plaintiffs are other provisions of the Home Rule Act which at General Statutes § 7-148 (c)(7)(H) empower municipalities to "[r]egulate and prohibit the carrying on within the municipality of any trade, manufacturer, business or profession . . . prejudicial to public health . . . or dangerous to, or constituting an unreasonable annoyance to, those living or owning property in the vicinity. . . . [p]reserve the public peace and good order. and do all things necessary or desirable to promote the public health." Id., (ii) through (xi).
The plaintiffs also argue in their Memorandum of Law in Opposition to Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction, p. 7, that "[t]he defendants have pointed to no language in the Home Rule Act nor to any case law, and Bridgeport is aware of none, that provides the type of limitation CT Page 15915 that they would have the Court read into the otherwise clear and broad language of Section § 7-148." The plaintiffs' argument misstates the law. In determining whether a municipality has authority for certain action pursuant to the Home Rule Act, the role of the trial court is to follow the rule of law articulated by the Connecticut Supreme Court, as follows: "We do not search for a statutory prohibition against [what is sought]; rather, we must search for statutory authority for the enactment." Avonside,Inc. v. Zoning Planning Commission, 153 Conn. 232, 236,215 A.2d 409 (1965); Buonocore v. Branford, 192 Conn. 399, 402,471 A.2d 961 (1984). Again, this rule logically results from the fact that a municipality has no inherent powers of its own; it is merely a creation of the state and its actions must be authorized by the state. New Haven Commission on Equal Opportunities v. YaleUniversity, 183 Conn. 495, 499, 439 A.2d 404 (1981); City Councilv. Hall, supra, 180 Conn. 248; Pepin v. Danbury, 171 Conn. 74,83, 368 A.2d 88 (1976); New Haven Water Co. v. New Haven,152 Conn. 563, 566, 210 A.2d 449 (1965); State ex. rel. Coe v. Filer,48 Conn. 145, 158 (1880). See also Buonocore v. Branford, supra,192 Conn. 402. The statutory authority to sue and be sued and to promote the public health fail as statutory authority to bring suit against gun manufacturers and distributors for recoupment of municipal expenditures.[7]
The plaintiffs' absence of statutory authority is apparent in view of the scope of its claims for relief. The plaintiffs seek broad injunctive relief relating to the manufacture, distribution and marketing of handguns.
Connecticut law clearly maintains that a municipality is preempted from action where the legislature has demonstrated an intent to occupy the entire field of regulation on the matter, or whenever the local ordinance irreconcilably conflicts with a statute. Dwyer v. Farrell, 193 Conn. 7, 14, 478 A.2d 257 (1984) (fact that local ordinance does not expressly conflict with statute will not save it when legislative purpose in enacting statute is frustrated by the ordinance); Times Mirror Co. v.Division of Public Utility Control, 192 Conn. 506, 511,473 A.2d 768 (1984); East Haven v. New Haven, 159 Conn. 453, 469,271 A.2d 110 (1970); Shelton v. City of Shelton, 111 Conn. 433, 447,150 A. 811 (1930). Dwyer v. Farrell, supra, 193 Conn. 7, involved a determination that a New Haven City ordinance regulating the retail sale of pistols and revolvers was preempted by state law. The court found "the New Haven ordinance removes an entire class of persons as potential sellers of handguns at retail. The state CT Page 15916 permit is rendered an illusory right because a casual seller residing in a non-business zone can have no real hope of ever conforming to the local ordinance. In this respect, the local ordinance conflicts with the legislative intent as expressed in the applicable statutes. The City has removed the right that the state permit bestows and thus has exceeded its powers." Id., 14.
The Connecticut legislature has enacted a statutory scheme of regulation on the sale, distribution and purchase of firearms within the State of Connecticut,[8] further evidencing the absence of plaintiffs' statutory authorization under the Home Rule Act for action that appears to conflict with state regulations. The Connecticut Supreme Court has recognized in the above referenced decisions, among many others, that municipalities have no inherent power under the Home Rule Act to act on matters of statewide concern. See also Windham TaxpayersAssociation v. Board of Selectmen, 234 Conn. 513, 662 A.2d 1281
(1995). Surely the scope and magnitude of the problems described by plaintiffs in their first amended complaint are serious matters of public health and safety that are of statewide
concern.
In Plaintiffs' Memorandum of Law in Opposition to the Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction, p. 7 n. 2, the plaintiffs concede that they do not claim nor do they need to claim parens patriae status. Nor do they or can they claim sovereign status akin to that enjoyed by the State of Connecticut. City Council v. Hall, supra,180 Conn. 248; 4 E. McQuillin, Municipal Corporations (3d Ed. Rev. 1992) § 13.03, p. 510.
As the court outlined earlier, the plaintiffs' standing to bring statutory claims under the PLA and CUTPA will be dealt with separately. Thus far it has been determined in this opinion that the plaintiffs are not statutorily authorized either to initiate this action under the Home Rule Act or to recoup municipal expenditures, nor are the plaintiffs blessed with the sovereign power of the state to protect the public health and welfare. Whether the plaintiffs have standing to maintain their non-claims therefore must turn on whether the common law allows them to.
The court will consider this issue by analysis similar to that relied upon by the federal appellate courts in the recent decisions affecting recoupment claims by insurance and health and CT Page 15917 welfare funds. A case recently dismissed by the Seventh Circuit Court of Appeals had been brought by the Blue Cross and Blue Shield Associations of Arkansas, Connecticut, Illinois, Kentucky, Missouri and North Dakota, joined by affiliated insurers (collectively "the Blues") against the tobacco industry, seeking "to sue directly for wrongs done to their insureds."International Brotherhood of Teamsters, Local 734 Health Welfare Trust Fund v. Philip Morris, Inc., ___ F.3d ___ (7th Cir. November 15, 1999). The Seventh Circuit noted that "[b]ecause three other appellate courts have issued comprehensive opinions on the merits of plaintiff's claims, we just hit the highlights, mentioning only our principle reasons for agreeing with these decisions." Id. Likewise, this court is persuaded by the same authority, in this case in which a city and its mayor seek to sue the handgun industry directly for alleged wrongs against the Bridgeport citizenry.
In dismissing the action before it, the Seventh Circuit noted that "[f]or more than one hundred years state and federal courts have adhered to the principle (under both state and federal law) that the victim of a tort is the proper plaintiff, and that insurers or other third-party providers of assistance and medical care to the victim may recover only to the extent their contracts subrogate them to the victims rights. Id. The decision provides one of the rationales for that rule:
 The outcome of smokers' suits is why the funds and "Blues" want to sue in their own names; they choose antitrust and RICO [instead of subrogation] because, in the Blues' [own] words, assumption of the risk, contributory negligence the similar defenses are not pertinent. This is exactly why plaintiffs must lose. A third-party payor has no claim if its insured did not suffer a tort; no rule of law requires persons whose acts cause harm to cover all of the costs, unless these acts were legal wrongs. The food industry puts refined sugar in many products, making them more tasty; as a result some people eat too much (or eat the wrong things) and suffer health problems and early death. No one supposes, however, that sweet foods are defective products on this account; chocoholics can't recover in tort from Godiva Chocolatier; it follows that the funds and the Blues can't recover from Godiva either. The same reasoning applies when the defendant is Philip Morris. If, as the Funds and the Blues say, the difference is that Philip Morris has committed civil wrongs while Godiva has not, then the way to establish CT Page 15918 this is through tort suits, rather than through litigation in which the plaintiffs seek to strip their adversaries of all defenses. Given the posture of these cases we must assume, as the complaints allege, that the cigarette manufacturers have lied to the public about the safety of their products. But lies matter only if customers are deceived. Whether smokers relied to their detriment on tobacco producers' statements is a central question in tort litigation, a question that cannot be dodged by the device of an insurers' direct suit.
Id.
Likewise, in this case the nefarious conduct of the gun industry should be addressed in a traditional tort suit in which the direct victims would have to overcome the industry's claims of proximate cause, assumption of risk and contributory negligence.
On this same issue, the Second Circuit observed that the plaintiffs "have sued in their own right for the money spent for plan participants and, in addition, for injuries and damages they insist were separate from the injuries to plan participants. . . . Laborers Local 17 Health Benefit Fund v.Philip Morris, Inc., supra, ___ F.3d ___. The court dismissed the case on the basis of the direct injury requirement of proximate cause. "Because the consequences of an act go endlessly forward in time and its causes stretch back to the dawn of human history, proximate cause is used essentially as a legal tool for limiting a wrongdoer's liability only to those harms that have a reasonable connection to his actions. The law has wisely determined that it is futile to trace the consequences of a wrongdoer's actions to their ultimate end, if an end there is." Id. Rather, relying on Holmes v. Securities Investor ProtectionCorp. , supra, 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed. 2th 532 (1992), the court realized the demand at common law for some direct relation between the injury asserted and the conduct alleged. "A plaintiff's right to sue . . . require[s] a showing that the defendant's violation not only was a "but for" cause of his injury, but was the proximate cause as well." Id., 268.
In Holmes, the Supreme Court discussed three policy concerns that courts should consider when determining whether a party may recover for injuries to a third person: (1) the difficulty of determining damages; (2) the possibility of multiple recoveries; and (3) the general interest in deterring injurious conduct and CT Page 15919 availability of other parties who are more directly injured and may be better able to vindicate this interest rather than the plaintiff. To this end, the Holmes court applied a proximate cause analysis, observing that proximate cause' is used to label generically the judicial tools used to limit a person's responsibility for the consequences of that person s own acts. . . . Thus, a plaintiff who complain[s] of harm flowing merely from the misfortunes visited upon a third person by the defendant's act is generally said to stand at too remote a distance to recover. . . . Although such directness of relationship is not the sole requirement of [proximate] causation, it has been one of its central elements." (Citations omitted.) Id., 268-69.
 This language tells us that to plead a direct injury is a key element for establishing proximate causation, independent of and in addition to other traditional elements of proximate cause. Thus, the other traditional rules requiring that defendant's acts were a substantial cause of the injury, and that plaintiff's injury was reasonably forseeable, are additional elements, not substitutes for alleging (and ultimately, showing) a direct injury.
Laborers Local 17 Health Benefit Fund v. Philip Morris, Inc., supra, ___ F.3d ___.
The case before this court essentially is a recoupment claim pleaded in nine counts. Plaintiffs are seeking damages analogous to those sought by the Blues and the Funds discussed above, as asserted against the tobacco industry. But the plaintiffs in this case have no greater authority to pursue monetary gain than did the plaintiffs in those actions. The plaintiffs may have suffered increased costs because of the defendants' products, but that "but for" argument cannot and does not overcome the necessary finding of proximate cause, relying on direct injury. At common law, loss that is purely contingent upon harm to third parties is too remote to be recoverable. Laborers Local 17 Health BenefitFund v. Philip Morris, Inc., supra, ___ F.3d ___.
The plaintiffs' claim relying on diminution of property values is similar to the "infrastructure harm" case discussed by the Second Circuit: it was found that the plaintiff's businesses may have been damaged by the defendant's ship breaking loose, crashing into and collapsing a bridge, causing disruption of river traffic; however CT Page 15920
 [p]roximate cause was lacking because those injuries were not "direct" but "occurred only because the downed bridge made it impossible to move traffic along the river;" in other words, the injuries were merely indirect and therefore too remote as a matter of law, since they were wholly derivative of an injury to the property of a third party, the bridge owner.
Laborers Local 17 Health Benefit Fund v. Philip Morris, Inc., supra, ___ F.3d ___. "[T]he critical question posed by the direct injury test is whether the damages a plaintiff sustains are derivative of an injury to a third party. If so, then the injury is indirect; if not, it is direct." Id. Damages that are derivative of harm suffered by third parties, being the citizens of Bridgeport in this case, are indirect and too remote to be recoverable by these plaintiffs under common law tort principles. "Consequently, because [the] defendants' alleged misconduct did not proximately cause the injuries alleged, [the] plaintiffs lack standing to bring [their common law tort] claims against [these] defendants." Id.
This conclusion is consistent with the three policy considerations addressed in Holmes. The Second Circuit in applying the Holmes policy factors noted the difficulties of proving damages as between a plaintiff insurer and a defendant cigarette maker, when superimposed on any calculation is the agency of the individual smokers deciding whether and how frequently to smoke. The difficulties presented in this case by the agency of the individuals firing guns and injuring themselves or others cannot be overcome. Calculating the impact of gun marketing on teen suicide and diminution of property values in Bridgeport would create insurmountable difficulties in damage calculation. "In this light, the direct injury test can be seen as wisely limiting standing to sue to those situations where the chain of causation leading to damages is not complicated by the intervening agency of third parties . . . from whom the plaintiffs' injuries derive." Laborers Local 17 Health BenefitFund v. Philip Morris. Inc., supra, ___ F.3d ___.
The benefit of recognizing early on the futility of a damage calculation in this case is supported by Beverly Hills Concepts,Inc. v. Schatz Schatz, Ribocoff Kotkin, 247 Conn. 48,717 A.2d 724 (1998), in which the Supreme Court overturned an award of $15.9 million in lost profits, "guided by the well-established CT Page 15921 principle that such damages must be proved with reasonable certainty." Id., 60. Plaintiffs cannot seriously maintain that reasonable certainty in calculating their damage claims is within the realm of possibility. As the Second Circuit noted in LaborersLocal 17: "[F]or us to rule otherwise could lead to a potential explosion in the scope of tort liability, which, while perhaps well-intentioned, is a subject best left to the legislature."Laborers Local 17 Health Benefit Fund v. Philip Morris. Inc., supra, ___ F.3d ___.
The second policy factor addressed in Holmes focuses on the possibility that "recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries." Holmes v. SIPC, supra, 503 U.S. at 269. In this instance, the State of Connecticut, insurance companies, health and welfare funds, the directly injured and others "at different levels of injury from the violative acts" would require just the type of complicated apportioning of damages which is to be avoided.
The third Holmes policy factor requires recognizing the availability of other persons (including directly injured victims) who might vindicate the law without any of the problems attendant upon suits by these plaintiffs. The directly injured victims of gun injuries would be able to proceed under traditional tort or perhaps nuisance[9] theories of redress.
Moreover, with respect to the medical expense claim, the state through medicaid reimbursement certainly would be in a better position than plaintiffs to seek recoupment, inasmuch as such action by the state is statutorily authorized. See General Statutes § 17b-265 and 42 U.S.C. § 1396k (concerning the State of Connecticut's right to medicaid reimbursement). In addition, such an action would meet the "general interest in deterring injurious conduct" standard noted in Holmes as the objective of its third policy consideration. Holmes v. SIPC, supra, 503 U.S. 269.[10]
As to the statutory claims, the plaintiffs' second and third counts of their first amended complaint are asserted under CUTPA. CUTPA has its own standing requirements. Jackson v. R.G. Whipple,Inc., 225 Conn. 705, 725-27, 627 A.2d 374 (1993). The plaintiffs lack a commercial relationship with the defendants or commercial nexus which is essential for standing under CUTPA. The act CT Page 15922 recognizes three catagories of plaintiffs: consumers; competitors and other business persons affected by unfair or deceptive acts.Connecticut Water Co. v. Town of Thomaston, Superior Court, judicial district of Hartford/New Britain at Hartford, Docket No. 535590 (April 24, 1997, Corradino, J.). In Marr v. WMXTechnologies Inc., Superior Court, judicial district of Litchfield at Litchfield, Docket No. 71542 (November 6, 1998, Sheldon, J.), it was noted that CUTPA was designed to provide broad protection to those who were directly harmed by unfair competition or unfair or deceptive trade practices. In Mather v.Birken Manufacturing Co., Superior Court, judicial district of Hartford/New Britain at Hartford, Docket No. 564862 (December 8, 1998, Hennessy, J.), an allegation of diminution in the value of plaintiff's leasehold and real property interest resulting from the defendant's manufacturing processes and storage of chemicals was insufficient to maintain a CUTPA claim. The court found that such a relationship did not constitute a consumer, competitor or business relationship. This allegation is analogous to plaintiff's claim for diminution of property values in Bridgeport as a result of defendant's conduct in distributing and manufacturing guns. Consequently, the plaintiffs lack standing to maintain their CUTPA claims alleged in the second and third count of the plaintiff's first amended complaint.
The plaintiffs also have asserted a claim under the PLA. General Statutes § 52-572m(c) of the PLA defines a "claimant" as: "a person asserting a product liability claim for damages incurred by the claimant or one for whom the claimant is acting in a representative capacity." General Statutes § 52-572m(b) defines a "product liability claim" as "all claims or actions brought for personal injury, death or property damage. . . ." The plaintiffs' indirect injury claims are insufficient to grant them standing under the PLA statutory requirements. The damages claimed by the plaintiffs were not incurred by them and they lack statutory authority to act for those directly injured.
The plaintiffs in this case also have asserted their own nuisance claim. In the fourth count of their first amended complaint, the plaintiffs claim that the defendants have "unlawfully facilitated, participated in and contributed to the illegal flow of handguns into Bridgeport, thereby causing damages and injury to Bridgeport's residents and Bridgeport. . . . Defendants' conduct has caused and continues to cause a public nuisance in Bridgeport." (First Amended Complaint, Fourth Count, ¶¶ 88 and 101.) Whether the plaintiffs are the proper parties CT Page 15923 to challenge the illegal flow of handguns within and between any city of the State of Connecticut, and whether they even have the authority to do so, are questions at the heart of the defendants' motions to dismiss.
"It is settled law that as a creation of the state, a municipality has no inherent powers of its own. . . . A municipality has only those powers that have been expressly granted to it by the state or that are necessary for it to discharge its duties and to carry out its objects and purposes. . . ." (Citations omitted.) Buonocore, supra,192 Conn. 401-402. "It is well established that a city's charter is the fountainhead of its municipal powers. . . . The charter serves as an enabling act, both creating power and prescribing the form in which it must be exercised. . . . (Citations omitted.) Keeney v.Town of Old Saybrook, 237 Conn. 135, 145, 676 A.2d 795 (1996). By what authority may the plaintiffs declare alleged illegal gun trade a public nuisance? Such authority must be found in the statutes and in the municipality's charter.
General Statutes § 7-148(c)(7)(E) grants a municipality the power to "[d]efine, prohibit and abate within the municipality all nuisances and causes thereof . . . and cause the abatement of any nuisance at the expense of the owner or owners of the premises on which such nuisance exists." The City of Bridgeport Charter ("charter"), Chapter 5, Section 8, p. 11, provides that "every act . . . placing any burden upon or limiting the use of private property, shall be by ordinance." At Section 7. (a), p. 9, the charter provides that "[t]he city council shall have the power, by the concurrent vote of the majority of the whole number of council members, with the written approval of the mayor, or over the mayor's veto, as herein provided, to make, alter, and repeal ordinances not inconsistent with the law." No such power is conferred on the mayor. See Charter, Chapter 3, Section 1(e).
No ordinance has been passed by the Bridgeport city council to achieve the remedies sought by this lawsuit. The admission by counsel[11] in plaintiffs' Memorandum of Law In Opposition To Defendants' Motion To Dismiss for Lack of Subject Matter Jurisdiction, p. 15, establishes that the city council did not at any time enact any ordinance with respect to the remedies sought in the fourth count of the plaintiffs' amended complaint. Instead, the "specific authority to bring the action [arises from] a specific line item in the Bridgeport budget adopted by the city council dealing with the budget for this case. CT Page 15924 Transcript of Hearing On Motion To Dismiss, p. 88.
By circumventing the ordinance requirement contained in the charter, the plaintiffs have deprived this court of the judicial review demanded in Dwyer v. Farrel, supra, 193 Conn. 7. As discussed previously in this memorandum, the Dwyer court was faced with a preemption issue involving handgun control. A New Haven handgun ordinance was challenged for requiring that a seller hold a federal firearms dealer license, prohibiting sales from a private dwelling, and requiring that sale premises be located in business zones. General Statutes §§ 29-28 through29-38 contained no such restrictions.
In its decision holding that the New Haven ordinance was preempted by state statute, the Connecticut Supreme Court wrote that "the statutory pattern evinces a legislative intent to regulate the flow of handgun sales and restrict the right to sell to those establishing the requisite qualifications." Dwyer v.Farrel, supra, 193 Conn. 13. It is clear to this court that the plaintiffs seek to act or have the court act to control the flow of handguns in a more comprehensive manner.
That the lawsuit itself is a line item in the city's budget falls far short of the requirement of the charter that action by the city council in this regard be taken in the form of an ordinance. "The charter of [Bridgeport] is its enabling act, and where the charter points out a particular way in which any act is to be done, the prescribed form must be pursued for the act to be lawful." Food, Beverage Express Drivers Local Union v. Shelton,147 Conn. 401, 405. 161 A.2d 587 (1960). As a matter of law, the court has no jurisdiction to entertain the fourth count of the first amended complaint.
Accordingly, on the basis of the above discussion, the first amended complaint is hereby dismissed for lack of subject matter jurisdiction. Judgment is hereby entered f or all appearing defendants, with the exception of Lorcin Engineering Company, Inc., which defendant is subject to a stay in bankruptcy.
Robert F. McWeeny, J.